# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| OCEANA, INC.<br>1350 Connecticut Ave. NW, Fifth Floor<br>Washington, DC 20036<br><br>Plaintiff,<br><br>v.<br><br>PENNY PRITZKER, in her official<br>capacity as Secretary of the United States<br>Department of Commerce<br>Office of the Secretary<br>Room 5858<br>14th Street and Constitution Ave., NW<br>Washington, DC 20230;<br><br>NATIONAL OCEANIC AND<br>ATMOSPHERIC ADMINISTRATION<br>Department of Commerce<br>Room 5128<br>14th Street and Constitution Ave., NW<br>Washington, DC 20230; and,<br><br>NATIONAL MARINE FISHERIES<br>SERVICE<br>Department of Commerce<br>Room 14636<br>1315 East-West Highway<br>Silver Spring, MD 20910<br><br>Defendants. | Civil Action No. _____ |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## INTRODUCTION

1.      This case concerns the fundamental data collection methodology for all thirteen federal fisheries in the waters of the Northeast United States. Federal fisheries law requires that for each fishery the fishery management plan must establish a data collection methodology, known as a standardized bycatch reporting methodology ("SBRM"), to assess the amount and type of bycatch (incidental catch that is often discarded, dead or dying). Northeast fishing vessels catch and discard significant amounts of fish, including protected species. Information collected on the amount and type of bycatch is essential to devising and carrying out conservation policies mandated by law and central to sustaining marine fisheries and healthy ecosystems, through prevention of overfishing, the recovery of already overfished fish populations, the protection and recovery of protected species such as threatened loggerhead sea turtles, and the minimization of the waste resulting from bycatch.

2.      On June 30, 2015, defendants, Secretary Pritzker, the National Oceanic and Atmospheric Administration ("NOAA"), and the National Marine Fisheries Service ("Fisheries Service"), promulgated a Final Rule purporting to establish the Fisheries Service's standardized bycatch reporting methodology for the thirteen Northeast United States federal fisheries. Magnuson-Stevens Fishery Conservation and Management Act Provisions; Fisheries of the Northeastern United States; Standardized Bycatch Reporting Methodology Omnibus Amendment: Final Rule, 80 Fed. Reg. 37,182 (June 30, 2015) (to be codified at 50 C.F.R. pt. 648) Print. (hereinafter "2015 SBRM Amendment").

3.      The 2015 SBRM Amendment purports to correct legal errors identified by the U.S. Court of Appeals for the D.C. Circuit when it vacated the prior 2008 SBRM Amendment. *See Oceana, Inc. v. Locke* ("*Oceana III*"), 670 F.3d 1238 (D.C. Cir. 2011).

4.      In practice, the SBRM not only fails to address the fundamental legal flaws identified by the D.C. Circuit, it effectively doubles down on the Fisheries Service's decade-long practice of underfunding and marginalizing its bycatch monitoring systems, substituting a "hoped-for result" in lieu of an actual methodology that will, at the very least, "provide decision makers and the public with a program of what actually will be done to improve bycatch reporting, and why these measures will be sufficient based on the best available science." *Oceana v. Evans (Oceana II)*, 384 F. Supp. 2d 203, 232 (D.D.C. 2005). Indeed, contrary to the D.C. Circuit's directive, the 2015 SBRM Amendment:

a.      Improperly limits its effort to establish an SBRM based on undefined assertions of "practicability;

b.      Establishes bycatch observer funding and allocation procedures that, by the Fisheries Service's own admission, are unlikely to provide the funding necessary to meet minimum levels of statistical precision;

c.      Concludes it is would be "premature" to establish a *nondiscretionary* method for fully funding Fisheries Services statutorily-mandated SBRM program, and instead, reserves to the agency the discretion to allocate available funding *"according to other priorities other than the SBRM process."* (emphasis added).

5.      Having failed to address the specific issues that prompted the D.C. Circuit to remand and vacate its prior attempt to prepare an SBRM Amendment, the Fisheries Service openly disregards its fundamental obligation to develop the 2015 SBRM Amendment in accordance with long-established substantive and procedural requirements under the Magnuson-Stevens Act, the Administrative Procedure Act ("APA"), and the National Environmental Policy Act ("NEPA").  The 2015 SBRM Amendment:

3

    a.     Summarily rejects consideration of newly-raised comments and alternatives deemed to have been "previously considered but rejected" during the development of the now-defunct 2008 SBRM Amendment;

    b.     Improperly characterizes the SBRM development effort as purely "administrative" in nature, despite contradictory acknowledgements that the SBRM's impacts are "real and will require adjusting expectations;"

    c.     Downplays the significance of the agency's SBRM Amendment's impact on the Fisheries Service's execution of policies regarding data collection and statistic precision in shaping conservation efforts, fishery management, maintenance of healthy fish stocks; and

    d.     Relies on an outdated and overly narrow Environmental Assessment to justify its failure to conduct an Environmental Impact Statement to take a hard look at the significant, direct, indirect, and cumulative impacts of the SBRM program.

6.     Unfortunately, these flaws undermine rather than advance the goals established by Congress when it first directed the Fisheries Service to establish a standardized bycatch reporting methodology almost 20 years ago. As a result, the Court must follow the D.C. Circuit's lead in *Oceana III* and vacate and remand the SBRM Amendment and final rule.

## JURISDICTION AND VENUE

7.     This action arises under the Magnuson-Stevens Fishery Conservation and Management Act ("Magnuson-Stevens Act"), 16 U.S.C. § 1855(f); the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–4370e; and the Administrative Procedure Act ("APA"), 5 U.S.C. § 706.

8.     This Court has jurisdiction over this action by virtue of the Magnuson-Stevens Act, which provides that "the district courts of the United States shall have exclusive jurisdiction

4

over any case or controversy arising under" the Magnuson-Stevens Act, 16 U.S.C. §1861(d), and

that regulations promulgated under the Act shall be subject to judicial review "if a petition for

such review is filed within 30 days after the date on which the regulations are promulgated or the

action is published in the Federal Register, as applicable," *id.* § 1855(f).

9.      This Court also has jurisdiction pursuant to 28 U.S.C. §1331, which grants the

district courts "original jurisdiction of all civil actions arising under the . . . laws . . . of the

United States" and 28 U.S.C. § 1361, which grants the district courts "original jurisdiction of any

action in the nature of mandamus to compel an officer or employee of the United States or any

agency thereof to perform a duty owed to the plaintiff."

10.     Jurisdiction is also found under the APA, 5 U.S.C. § 706, which authorizes a

court to "set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious,

an abuse of discretion, or otherwise not in accordance with law," and 5 U.S.C. § 704, which

provides a right to judicial review of all "final agency action for which there is no other adequate

remedy in a court."

11.     Venue is proper in this district court pursuant to 28 U.S.C. § 1391(e).

12.     The Court may issue a declaratory judgment in this case pursuant to 28 U.S.C.

§§ 2201–2202, and may grant relief pursuant to the Magnuson-Stevens Act, 16 U.S.C. §§

1861(d) and 1855(f), and the APA, 5 U.S.C. § 706.

## PARTIES

13.     Plaintiff, Oceana, Inc., is a non-profit international advocacy organization

dedicated to protecting and restoring the world's oceans through policy, advocacy, science, law,

and public education. Oceana has over 375,000 members around the world, including over

80,000 members in the coastal states from Maine to North Carolina. Oceana is organized under

the laws of the District of Columbia, and maintains its headquarters in Washington, D.C. It has

offices or staff in eleven states (Alaska, California, Florida, Louisiana, Maine, Massachusetts, New York, North Carolina, Oregon, South Carolina, and Virginia) and twelve foreign countries (Belgium, Belize, Brazil, Canada, Chile, Denmark, Finland, Peru, the Philippines, Spain, Switzerland, and the United Kingdom). Through its policy, scientific, litigation, and grass-roots activities, Oceana has been a prominent advocate for the collection of statistically reliable fisheries data and the conservation of marine resources. In particular, Oceana has long advocated for the conservation of marine fisheries through the "count, cap, and control" approach, which emphasizes statistically reliable fisheries data collection as the fundamental "count" component to management. Oceana has participated in administrative proceedings before government agencies, litigated before courts, and issued reports to the public, all in the interest of protecting marine resources and wildlife.

14.     Oceana's members, supporters, staff, officers, and directors (hereinafter, "members") use and enjoy the oceans for numerous activities, including fishing, scuba diving, snorkeling, boating, swimming, beach walking, research, and study. Oceana's members value a healthy marine environment. Environmental injury caused by unsustainable fishing practices in Northeast fisheries directly impacts Oceana's members. Such injuries include overfishing fish populations in which they have an interest in commercially or recreationally fishing, and injury to their ability to observe and study sea turtle populations that continue to be depleted because of unsustainable management caused, in part, by inadequate data collection.

15.     Oceana's staff reviews and analyzes fisheries bycatch data to advance Oceana's mission of conserving marine resources. Oceana's staff uses this data to inform Oceana's members and the public on the condition of marine resources and to advocate for better policies to conserve Northeast commercial and recreational fisheries and to protect endangered and

threatened sea turtles. The failure to collect statistically reliable data on the amount and type of

bycatch injures the ability of Oceana and its staff to inform Oceana's members and to

accomplish its mission of participating in marine policymaking in order to develop management

measures that will sustain our marine resources.

16.     Oceana and its members suffer direct and immediate injury as a result of the

Fisheries Service's failure to establish a standardized bycatch reporting methodology that

collects statistically reliable data. These interests will continue to be impaired unless the Court

grants the relief requested herein.

17.     Defendant, Penny Pritzker, is Secretary of the United States Department of

Commerce. She is sued in her official capacity as the chief officer of the federal department

charged by the United States Congress with managing United States marine fisheries.

18.     Defendant, National Oceanic and Atmospheric Administration, is an agency of

the United States Department of Commerce with supervisory responsibility for the Fisheries

Service. The Secretary of Commerce has delegated responsibility for managing United States

marine fisheries to NOAA, which in turn has sub-delegated that responsibility to the Fisheries

Service.

19.     Defendant, National Marine Fisheries Service, is an agency of the United States

Department of Commerce that has been delegated the responsibility to manage United States

marine fisheries through fishery management plans, plan amendments, and regulations

implementing those plans and plan amendments. The Fisheries Service is the United States

government agency with primary responsibility for managing marine fisheries.

## STATUTORY AND REGULATORY BACKGROUND

### I.   THE ADMINISTRATIVE PROCEDURE ACT

20.     The APA provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. "Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review." *Id.* § 704.

21.     In an APA suit, the reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A); "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," *Id.* § 706(2)(C); or "without observance of procedures required by law," *Id.* § 706(2)(D).

22.     "Under the arbitrary and capricious standard . . . the agency's decision is arbitrary or capricious if the agency relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before it, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Oceana, Inc. v. Pritzker*, 24 F. Supp. 3d 49, 58–59 (D.D.C. 2014) (internal citations and quotations omitted).

23.     Under the arbitrary and capricious standard, the agency must "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (U.S. 1983).

8

24.    An agency is required to consider responsible alternatives to its chosen policy and to give a reasoned explanation for its rejection of such alternatives. *Am. Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 242 (D.C. Cir. 2008) (internal citations and quotations omitted).

25.    "Public notice and comment regarding relied-upon technical analysis . . . are safety valves in the use of . . . sophisticated methodology. By requiring the most critical factual material used by the agency be subjected to informed comment, the APA provides a procedural device to ensure that agency regulations are tested through exposure to public comment, to afford affected parties an opportunity to present comment and evidence to support their positions, and thereby to enhance the quality of judicial review." *Id.* at 236 (internal citations and quotations omitted).

26.    "[An] agency's failure to respond to petitioners' specific challenges in the record is fatal [where] the points raised in the comments were sufficiently central that agency silence . . . demonstrate[s] the rulemaking to be arbitrary and capricious." *Am. Mining Cong. v. EPA*, 907 F.2d 1179, 1190 (D.C. Cir. 1990) (internal citations and quotations omitted).

27.    "The requirement that agency action not be arbitrary and capricious includes a requirement that the agency . . . respond to relevant and significant public comments." *Cape Cod Hosp. v. Sebelius*, 630 F.3d 203, 211 (D.C. Cir. 2011) (internal citations and quotations omitted).

28.    When a model's methodology is challenged by a commenter, "*the agency must provide a complete analytic defense of its model.*" *Appalachian Power Co. v. EPA*, 251 F.3d 1026, 1035. (D.C. Cir. 2001) (internal citations omitted) (emphasis added).  The agency's failure to respond to significant comments in this way generally "demonstrates that the agency's decision was not based on a consideration of the relevant factors, "*Lilliputian Sys., Inc. v.*

*Pipeline & Hazardous Materials Safety Admin.*, 741 F.3d 1309, 1313 (D.C. Cir. 2014) (internal citations omitted).

## II.   THE MAGNUSON-STEVENS FISHERY CONSERVATION AND MANAGEMENT ACT

29.     The Magnuson-Stevens Act establishes an elaborate system for conserving and managing fish populations found primarily in United States territorial waters and in the exclusive economic zone, which extends from the boundaries of state waters (three miles from shore in the Northeast United States) to 200 miles offshore or to an international boundary with neighboring countries.

30.     The Magnuson-Stevens Act creates eight regional fishery management councils and charged them with preparing fishery management plans for all managed species. Two of those regional councils, the New England Fishery Management Council and the Mid-Atlantic Fishery Management Council, have jurisdiction over the thirteen federal fisheries in the Northeast United States. 16 U.S.C. § 1852(a)(1)(A)–(B).

31.     The Magnuson-Stevens Act makes Councils initially responsible for developing plans and plan amendments for each fishery "that requires conservation and management" within the councils' respective geographic areas of authority. *Id.* § 1852(h)(1).

32.     Councils must include in their fishery management plan ("FMP") or FMP amendments the measures necessary to conserve and manage particular species of fish. *Id.* § 1853(a)(1)(A).

33.     After developing a plan or plan amendment, a council submits the rule to the Secretary of Commerce, who, acting through the Fisheries Service, evaluates the rule for consistency with the national standards set forth at 16 U.S.C. § 1851(a), the other provisions of the Magnuson-Stevens Act, and any other applicable law. If the Secretary determines that the

rule is consistent with all applicable law, the Secretary approves the rule. Otherwise the Secretary may completely, or partially, disapprove the rule. *Id.* §1854(a).

34.     The Magnuson-Stevens Act sets deadlines for the Secretary to approve, disapprove, or partially approve amendments and promulgate implementing regulations. *Id.* § 1854(a)–(b).

35.     The Magnuson-Stevens Act defines "bycatch" as "fish which are harvested in a fishery, but which are not sold or kept for personal use and includes economic and regulatory discards. . . ." *Id.* § 1802(2).

36.     When it amended the Magnuson-Stevens Act in 1996 to add new provisions requiring the Fisheries Service to monitor bycatch, to minimize bycatch to the extent practicable, and minimize bycatch mortality to the extent bycatch cannot be avoided, Congress expressed its concern about the significant amount of bycatch and waste that occurs in the Nation's fisheries. In the words of one of the 1996 amendments' principal sponsors, Congress intended the 1996 amendments to "bring a stop to this inexcusable amount of waste." 142 Cong. Rec. S10810 (daily ed. Sept. 18, 1996) (statement of Sen. Ted Stevens).

37.     Section 301(a) of the Magnuson-Stevens Act establishes national standards for fishery management plans, requiring that "conservation and management measures shall, to the extent practicable, (A) minimize bycatch and (B) to the extent bycatch cannot be avoided, minimize the mortality of such bycatch." 16 U.S.C. § 1851(a)(9).

38.     The 1996 amendments specifically required that each FMP "establish a standardized reporting methodology to assess the amount and type of bycatch occurring in the fishery." *Id.* § 1853(a)(11).

39.   Regulations promulgated by the Fisheries Service under the Magnuson-Stevens Act are subject to judicial review under the APA, 5 U.S.C. § 701 *et seq.*

40.   In a 2002 petition, Oceana requested that the Fisheries take action to:

a.   Develop and implement a workplan for placing observers on enough fishing trips to provide accurate and precise bycatch estimates in all fisheries;

b.   Incorporate reasonable estimates of bycatch into all total allowable catch levels and other restrictions on fishing;

c.   Set absolute limits on the amount of directed catch and bycatch in each fishery; and

d.   Develop, approve, and implement bycatch assessment and reduction plans for commercial and recreational fisheries.

Stephen E. Roady, President of Oceana, *Petition to Secretary of Commerce to Count, Cap, and Control Bycatch*, Feb. 28, 2002; *Notice of Receipt of Petition*, 67 Fed. Reg. 19154 (April 18, 2002).

41.   In response, in 2003, the National Marine Fisheries Service established its National Bycatch Strategy. Fisheries Service, *Response to Petition*, 68 Fed. Reg. 11501, 11516 (March 11, 2003).

42.   In 2004, as part of its National Bycatch Strategy, the Fisheries Service issued a Technical Memorandum establishing "A national approach to standardized bycatch monitoring programs. Fisheries Service, *Evaluating bycatch: A national approach to standardized bycatch monitoring programs. U. S.* Dept. of Commerce, *NOAA Tech. Memo*, NMFS-F/SPO-66 (2004) ("National Approach Memo"). The National Approach Memo recommended "precision goals" for estimates of bycatch based on the "coefficient of variation (CV)" for each estimate. *Id.* at v.

Using this process, a smaller CV indicates a higher level of precision. For both Protected Species and Fishery Resources, the National Approach Memo recommended setting precision goals at between 20 and 30 percent CV. *Id.* at 64.

43.     "Bycatch mortality can decrease the sustainability of a fishery and the net benefits provided by that fishery. [I]f bycatch mortality is not monitored adequately, it increases the uncertainty concerning total fishing-related mortality, which in turn makes it more difficult to assess the status of stocks of fish and other bycatch species, to set the appropriate optimum yields and overfishing levels for fish stocks, to determine acceptable levels of bycatch for other bycatch species, and to ensure that the optimum yields are attained, that overfishing does not occur and that the acceptable levels of bycatch for other species are not exceeded." *Id.* at 85.

44.     The D.C. Circuit has interpreted the statute as imposing an unqualified mandate on the Fisheries Service to establish the SBRM regardless of whether the agency may prefer to use its limited resources elsewhere:

> "[T]he qualifier 'to the extent practicable' does not appear in or modify the first clause of [section 303(a)(11)], where the Fisheries Service is directed to prepare a standardized methodology. When a statute commands an agency without qualification to carry out a particular program in a particular way, the agency's duty is clear; if it believes the statute untoward in some respect, then it should take its concerns to Congress, for in the meantime it must obey the statute as written."

*Oceana III*, 670 F.3d at 1242 (internal citations and quotations omitted).

45.     Notwithstanding the D.C. Circuit's express rejection of a practicability qualifier under section 303, the 2015 Final Rule continues to cite "practicability" concerns as a basis for

limiting its obligation to address sampling bias and develop realistic SBRM budgets and funding

projections. *See* 2015 Final Rule at 37,183 ("The SBRM uses sampling designs developed to

minimize bias to the maximum extent practicable."); *id.* at 37,188 ('it was not practicable to try

to enumerate all possible expenses that may be needed to support the SBRM.").

## III.    THE NATIONAL ENVIRONMENTAL POLICY ACT

46.    Before federal agencies such as the Fisheries Service take a major action

significantly affecting the quality of the human environment, NEPA requires that the agencies

prepare a detailed statement evaluating "the environmental impact of the proposed action." 42

U.S.C. § 4332(2)(C)(i).

47.    Council on Environmental Quality ("CEQ") and NOAA guidelines permit the

Fisheries Service to develop an environmental assessment ("EA") to determine whether it is

necessary to develop a more detailed environmental impact statement ("EIS"). 40 C.F.R.

§ 1501.4; NOAA Administrative Order 216-6 § 5.03. To make that determination, the EA must

evaluate the direct, indirect, and cumulative impacts of the proposed action. 40 C.F.R. § 1508.8-

9; NOAA Administrative Order 216-6 § 5.03b.

48.    The terms "effects" and "impacts" are synonymous as used in NEPA regulations.

*Id.* § 1508.8. "Effects" include "[i]ndirect effects which . . . are later in time or farther removed

in distance, but are still reasonably foreseeable." *Id.* § 1508.8(b).

49.    The type of "effects" that are contemplated include: ecological (such as the effects

on natural resources and on the components, structures, and functioning of affected ecosystems),

aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative.

*Reed v. Salazar*, 744 F. Supp. 2d 98, 103 (D.D.C. 2009).

50.     The term "cumulative impact" refers to "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions." *Id.* § 1508.7.

51.     CEQ regulations identify several factors to consider in determining whether an EIS is necessary, including "the degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks," "the degree to which the action may establish a precedent . . . or represents a decision in principle about a future consideration," "whether the action is related to other actions with individually insignificant but cumulatively significant impacts," and the likelihood that the decision may result in a violation of federal environmental laws. *Id.* § 1508.27(b).

52.     For purposes of determining whether to prepare an EIS, "[s]ignificance cannot be avoided by terming an action temporary or by breaking it down into small component parts." *Id.* § 1508.27(b)(7).

53.     NOAA guidelines establish more specific guidance for determining whether an EIS is necessary, including whether the action jeopardizes the sustainability of a target or nontarget species; whether the action may be reasonably expected to adversely affect endangered or threatened species; and whether the action may have substantial cumulative adverse effects. National Marine Fisheries Service, *Instruction 30-124-1: Administration and Management Establishment of FONSI Preparation Policy Guidelines for the Preparation of a Finding of No Significant Impact* (July 22, 2005, Renewed August 2014).

54.     A central function of NEPA's requirements is for the agency to consider environmental impacts before approving a project. Therefore, delaying consideration of relevant

and reasonable alternatives until a future date violates the "hard look" requirement. *Flaherty v. Bryson*, 850 F. Supp. 2d 38, 72 (D.D.C. 2012) (internal quotation marks and citations omitted).

55.     Because disclosure of information critical to decision-making is a primary function of NEPA, an agency cannot be allowed to avoid producing a thorough EIS by ignoring a possible, but unexplored, environmental issue in the EA. *Gov't of the Province of Manitoba v. Norton*, 398 F. Supp. 2d 41, 66 (D.D.C. 2005)

56.     "An environmental assessment that fails to address a significant environmental concern can hardly be deemed adequate for a reasoned determination that an EIS is not appropriate." *Found. on Econ. Trends v. Heckler*, 756 F.2d 143, 154 (D.C. Cir. 1985).

## FACTUAL AND PROCEDURAL BACKGROUND

### I.     THE FISHERIES SERVICE REPEATEDLY DISREGARDED STATUTORY DIRECTIVES TO ESTABLISH A PARTICULAR SBRM

57.     The District Court ruled in *Conservation Law Found. v. Evans*, 209 F. Supp. 2d 1, 13 (D.D.C. 2001) that the Fisheries Service violated the Magnuson-Stevens Act and the APA by failing to conduct a review of its bycatch reporting methodology in the New England groundfish fishery and by failing to adopt new measures to report and assess bycatch in the New England groundfish fishery.

58.     After the Fisheries Service issued a rule on remand, the Court again reviewed the New England Groundfish Fishery Management Plan for compliance with the Magnuson-Stevens Act. The Court ruled in *Oceana v. Evans* (*Oceana I*), No. 04-0811, 2005 WL 555416 (D.D.C. Mar. 9, 2005), that Amendment 13 to the Groundfish Fishery Management Plan failed to "establish" a standardized bycatch reporting methodology, because while it set forth a performance goal of 5% observer coverage, it left the actual level of observer coverage completely to the discretion of the agency. *Id.* at *42.

59.     The Court held that "an FMP that merely *suggests a hoped-for result, as opposed to establishing a particular standardized methodology*, does not measure up to the statute's requirements." *Id.* at *40 (emphasis added and internal quotation marks and citation omitted).

60.     In a parallel case, the Court found Amendment 10 to the Atlantic Sea Scallop Fishery Management Plan unlawful, because it too failed to "establish" a standardized bycatch reporting methodology, instead leaving the allocation of observers up to the Northeast Regional Administrator. *Oceana v. Evans* (*Oceana II*), 384 F. Supp. 2d 203, 232 (D.D.C. 2005).

61.     The Court found that "[i]nstead of analyzing what type of program-whether a mandated level of coverage or some other mechanism-would succeed in producing the statistically reliable estimates of bycatch needed to better manage the fishery, the FMP essentially assigns this task to the Regional Administrator." *Id.* at 233–34 (footnote omitted).

62.     The *Oceana II* Court found that "rather than keying an expansion of [the preexisting observer] program to some assessment of what levels were necessary to generate reliable estimates, [Amendment 10] instead *linked the number of additional observers to a funding mechanism without considering whether this program would be adequate*." *Id.* at 232-33 (emphasis added).

63.     As the *Oceana II* Court explained, "Though the Regional Administrator's discretion may be guided by the goal of achieving an "appropriate" level of accuracy, the statute requires a methodology, not a goal. A methodology need not necessarily be detailed, but it must at the very least provide decision makers and the public with a program of what actually will be *done* to improve bycatch reporting, and why these measures will be sufficient based on the best available science." *Id.* at 234 (alteration in original).

64.     In response to the remand orders in *Oceana I* and *Oceana II*, the Fisheries Service

conducted a rulemaking to establish a standardized bycatch reporting methodology for all

thirteen Northeast federal fisheries, including the scallop and groundfish fisheries. *Northeast*

*Region Standardized Bycatch Reporting Methodology Omnibus Amendment*, 73 Fed. Reg. 4736,

4737 (Jan. 28, 2008) ("2008 SBRM Rule"). The 2008 SBRM Rule implemented approved

management measures contained in the Northeast Region Omnibus SBRM Amendment, a

document originally approved by the Fisheries Service on behalf of the Secretary of Commerce

on October 22, 2007 ("2008 SBRM Amendment").

65.     In preparing the 2008 SBRM Rule, the Fisheries Service declined to prepare an

EIS, justifying its reliance on an EA and FONSI by asserting that the 2008 SBRM Amendment

simply codified the status quo practices of the day. *See* 2008 SBRM Amendment ("The preferred

alternatives would continue the status quo program for bycatch reporting and monitoring for

federally managed species managed by the New England and Mid-Atlantic Fishery Management

Councils. There are no economic or social impacts associated with this alternative that could be

distinguished from taking no action.").

66.     Throughout the development of the 2008 SBRM Amendment and 2008 SBRM

Rule, Oceana participated vigorously in the rulemaking, submitting written comment letters.

Oceana, *Comments Concerning the Northeast Region Standardized Bycatch Reporting*

*Methodology Omnibus Amendment*, 72 Fed. Reg. 41047 (July 26, 2007) and *Proposed*

*Implementing Regulations*, 72 Fed. Reg. 46588 (Aug. 21, 2007) from Oceana, Inc., to Patricia A.

Kurkul, Regional Administrator, Fisheries Service (Sept. 24, 2007); Oceana, *Comments*

*Concerning the Northeast Region Standardized Bycatch Reporting Methodology Omnibus*

*Amendment from Oceana, Inc.*, to Patricia A. Kurkul, Regional Administrator, Fisheries Service

(June 4, 2007); *Oceana, Comments Concerning the Omnibus Standardized Bycatch Reporting Methodology Fishery Management Plan Amendment for the New England and Mid-Atlantic Regions from Oceana, Inc.*, to Patricia A. Kurkul, Regional Administrator, Fisheries Service (Dec. 22, 2006).

67.    Following the promulgation of the 2008 SBRM Rule, Oceana filed a timely challenge in federal court, identifying fatal flaws in the 2008 SBRM Amendment framework.

68.    The challenge identified significant and fatal flaws in the 2008 SBRM. Oceana's complaint demonstrated that the 2008 SBRM Amendment would cripple the ability of the Fisheries Service to maintain sustainable and economically viable commercial fisheries in the Northeast region. The complaint further asserted that the 2008 SBRM Amendment threatened the sustainability of state fisheries affected by bycatch in federal fisheries and jeopardized the continued existence and recovery of protected species. These legal and regulatory flaws included:

      a.    The SBRM contained a vast loophole allowing the Fisheries Service, on its own initiative and without independent review, to avoid meeting statistical performance standards in any year in which it deems that "operational constraints" prevent it from fully implementing the SBRM;

      b.    The SBRM set forth no standards for determining whether and when so-called "operational constraints" exist;

      c.    For any given year that the Fisheries Service concluded that "operational constraints" exist, the SBRM failed to identify an alternative method of satisfying the performance standard, undermining the statistical reliability of collected information on the amount and type of bycatch of any species.

d.      The SBRM's inability to ensure statistically reliable bycatch data would prevent federal and state fisheries managers from accurately assessing the condition of fish populations to determine if they have been overfished or are threatened with overfishing.

e.      The SBRM's inability to ensure statistically reliable data as to the amount and type of the bycatch component of the overall catch in each fishery would undermine efforts to enforce caps on fishing levels designed to prevent overfishing;

f.      The SBRM's inability to ensure statistically reliable bycatch data would prevent the Fisheries Service from accurately assessing the condition of protected species populations and enforce caps on incidental take levels designed to prevent jeopardy of extinction and allow the recovery of the protected species;

g.      Given the extensive cumulative environmental impacts of this major federal action, the Fisheries Service erred when it issued a FONSI based on a limited EA rather than conducting the legally-required Environmental Impact Statement ("EIS");

h.      The Fisheries Service's EA failed to take a hard look at the environmental impacts of this major federal action, failed to consider available reasonable alternatives, and failed to use timely information and data.

i.      As a result of these flaws, the Fisheries Service failed to establish a standardized bycatch reporting methodology that will produce the statistically reliable information on the amount and type of bycatch in the Northeast federal fisheries that is required to manage them sustainably in compliance with controlling law.

69.     The District Court ruled for the Fisheries Service on all counts. *Oceana, Inc. v. Locke*, 725 F. Supp. 2d 46 (2010). On appeal, the D.C. Circuit reversed, directing the District

Court to vacate the SBRM Amendment and SBRM Final Rule and remand the matter to the Fisheries Service. *Oceana III*, 670 F.3d at 1243. The D.C. Circuit held that "the Fisheries Service did not 'establish' a standardized methodology under the Fisheries Act." The Court explained that "[a]t best the rule sets a benchmark from which the agency freely can and apparently does significantly depart in its annual allocation of observers." *Id*. In accordance with the D.C. Circuit's mandate, the District Court remanded the rule to the Fisheries Service. *Oceana, Inc. v. Locke*, No. 08-318, 2011 U.S. Dist. LEXIS 147125 (D.D.C., Sept. 15, 2011).

70.    In order to comply with Magnuson-Steven's Act directive to "establish a ... methodology," Fisheries Service "regional officials must fund and allocate independent observers to gather data on bycatch from each "fishing mode," or combination of vessel type and fishing gear" *Oceana III*, 670 F.3d 1239-1240 (D.C. Cir. 2011).

71.    Statistically reliable SBRM data is necessary "'in order to ensure that the effectiveness of the [Amendment] can be measured, tracked, and utilized to effectively  allocate the appropriate number of observer sea days[.]'" *Id*.

72.    In order to comply with Magnuson-Steven's Act directive to "establish a . . . methodology," "the [Fisheries Service] must fund enough observer voyages to generate statistically reliable data." *Id*.

73.    In order to provide statistically reliable data under the 2015 SBRM, the data collected must be "sufficient to produce a coefficient of variation (CV) of the discard estimate of no more than 30 percent." *Id*.

74.    In remanding the 2008 SBRM and Final Rule to the Fisheries Service, the D.C. Circuit rejected the Fisheries Service's assertion that "financial constraints" justified underfunding a core requirement of the Magnuson-Stevens Act, saying "[p]erhaps the only

constant is that no agency ever has enough money to do everything it might want to do. Be that as it may, no reasonable interpretation of the statutory instruction to 'establish a standardized methodology' would allow the agency to reserve to itself effectively complete discretion to trigger an exemption." *Id.* at 1242.

75.     The D.C. Circuit also rejected the Fisheries Service's implication that "funding constraints" are necessarily outside the agency's control:

> The Fisheries Service nowhere claims the Congress appropriates a specific
> amount for the observation program or prohibits the Fisheries Service from using
> other appropriated or, for that matter, nonappropriated funds for that purpose. See
> Comments of Oceana Concerning the Northeast Region Standardized Bycatch
> Reporting Methodology Omnibus Amendment, Sept. 24, 2007, at 8 ("While the . .
> . Amendment established a mechanism which would allow regional councils to
> establish industry-funding for observers through future rulemakings," *see* 73 Fed.
> Reg. at 4,740, the Fisheries Service "never considered using industry funding to
> ensure that the [precision] standard was always achieved"). Because the agency
> determines both the amount of funding required for bycatch observation and the
> funding it will allocate for that purpose, it can determine the stringency of this
> supposedly "external" constraint and thus free itself at will from the methodology
> it purportedly "established."

*Id.*

76.     Having vacated and remanded the entire rule and 2008 SBRMA based on violations of the Magnuson-Stevens Act, the D.C. Circuit dismissed Oceana's remaining claims under the APA and NEPA as moot, seeing no need to reach the merits. *Oceana III,* 670 F.3d at

1243. In doing so, however, the Court made no suggestion that review of a future SBRM

Amendment or implementing rule would be subject to truncated review, or a presumption of

partial validity.

77.     On December 15, 2014, the Fisheries Service published the Mid-Atlantic and

New England Fishery Management Councils' Omnibus Amendment to the Fishery Management

Plans of the Northeastern U.S. to establish a Standardized Bycatch Reporting Methodology.

Fisheries Service, *Magnuson-Stevens Fishery Conservation and Management Act Provisions;*

*Fisheries of the Northeastern United States; Northeast Region Standardized Bycatch Reporting*

*Methodology Omnibus Amendment: Notice Of Availability Of Proposed Fishery Management*

*Plan Amendment; Request For Comments,* 79 Fed. Reg. 74056 (Dec. 15, 2014).

78.     On January 21, 2015, the Fisheries Service requested comments on proposed

regulations to implement the 2014 Draft SBRM Amendment. Fisheries Service, *Magnuson-*

*Stevens Fishery Conservation and Management Act Provisions; Fisheries of the Northeastern*

*United States; Northeast Region Standardized Bycatch Reporting Methodology Omnibus*

*Amendment: Proposed Rule; Request For Comments,* 80 Fed. Reg. 2898 (Jan. 21, 2015).

79.     On February 13, 2015, Oceana submitted timely comments to the regulatory

dockets for both the 2014 Draft SBRM Amendment and the 2015 Proposed Rule.  These

comments identified significant flaws in the proposed SBRM Amendment, the implementing

rule, and regulatory development process. Comments of Oceana on the Notice of Availability

and Notice of Proposed Rule Concerning Magnuson-Stevens Fishery Conservation and

Management Act Provisions; Fisheries of the Northeastern United States; Northeast Region

Standardized Bycatch Reporting Methodology Omnibus Amendment, Dockets No. 2014-29216

and 140904749-4999-01 from Oceana, Inc. to the Fisheries Service (Feb. 13, 2015) ("2015 Comments").

80.   Oceana's 2015 Comments further explained that:

a.   The 2015 SBRM Amendment fails to address problems regarding the SBRM's bias and lack of precision;

b.   The Fisheries Service fails to provide a scientific basis for its choice of a 30% coefficient of variation ("CV"), and failed to consider other reasonable alternatives;

c.   The SBRM relies on old data, disregarded much more current data, and failed to apply the best available science.

d.   The SBRM alternatives analysis applies an outdated understanding of how fisheries function and are regulated, disregarding now common regulatory practices like Annual Catch Limits and Accountability Measures and the need for stock-level bycatch information;

e.   The SBRM's "funding triggers" lack a rational methodology and fail to resolve issues previously raised by the D.C. Circuit and Oceana;

f.   The Agency failed to conduct an adequate alternative analysis for SBRM funding and allocation; and

g.   The Environmental Assessment fails to meet statutory requirements under the National Environmental Policy Act ("NEPA"), the Magnuson-Stevens Act (the "Magnuson-Stevens Act"), and the Administrative Procedure Act ("APA").

81.   During the comment period, multiple commenters addressed the range of species that would be considered under the SBRM, asserting that without a method to assess and report bycatch of all species, the SBRM is incomplete. Commenters claimed the Act's definition of

bycatch includes more species than those contemplated in the amendment, and includes non-commercial and unregulated fish species (especially those considered at risk, such as wolfish, cask, and corals), as well as highly migratory species and fish managed by the Atlantic States Marine Fisheries Commission. SBRM Amendment Appendix E15-E16.

82.     On March 13, 2015, the Fisheries Service approved, on behalf of NOAA, a revised draft of the Northeast Region Standardized Bycatch Reporting Methodology Omnibus Amendment. *See* Fisheries Service, *Standardized Bycatch Reporting Methodology: An Omnibus Amendment to the Fishery Management Plans of the Mid-Atlantic and New England Regional Fishery Management Councils* (March 2015) ("2015 SBRM Amendment").

83.     On March 10, 2015, the Administrator for the Fisheries Service Greater Atlantic Region signed the FONSI stating:

> In view of the information presented in this document and the analysis contained in the supporting Environmental Assessment prepared for the SBRM Omnibus Amendment, it is hereby determined that the SBRM Omnibus Amendment will not significantly impact the quality of the human environment as described above and in the supporting Environmental Assessment. In addition, all beneficial and adverse impacts of the proposed action have been addressed to reach the conclusion of no significant impacts. Accordingly, preparation of an EIS for this action is not necessary.

80 Fed. Reg. at 37185.

84.     On June 29, 2015, the Fisheries Service promulgated a final rule establishing regulations to implement the 2015 SBRM Amendment. *Id.* at 37182.

25

**II.     THE FISHERIES SERVICE'S 2015 SBRM AMENDMENT VIOLATES THE STANDARDS ESTABLISHED BY THE D.C. CIRCUIT**

85.     The D.C. Circuit rejected the Fisheries Service's first attempt to "establish a standardized reporting methodology to assess the amount and type of bycatch occurring in all thirteen Northeast federal fisheries," ruling that the Fisheries Service had set an "impermissibly vague trigger" using an "optional" standard of precision that left compliance with the Magnuson-Stevens Act to the Agency's budgetary discretion. *Id.* at 1242.

86.     The Fisheries Service's second attempt at a Northeast U.S. SBRM fails to remedy the flaws expressly identified by the *Oceana III* Court and disregards many other significant and fatal deficiencies under the Magnuson-Stevens Act, APA, and NEPA raised in Oceana's comments.

87.     The 2015 Final Rule adopts a precision standard of 30 percent Coefficient of Variation (CV) for the SBRM – representing the lowest point within the Fisheries Service's acceptable precision range of 20 percent to 30 percent. See National Approach Memo at v.

88.     In explaining its decision process for its selection, the Fisheries Service offered "little scientific justification for choosing one CV level (e.g., 28 percent) over any other specific CV level (e.g., 27 percent)," a particularly notable admission given the critical role the CV plays in determining the precision of the SBRM's bycatch estimates used to guide the agency's conservation measures. SBRM Amendment at 256.

89.     The 30 percent CV performance standard functions both as a mechanism to determine the level of observer coverage required in each fishing mode and as a diagnostic tool after the fact to evaluate whether the observer coverage provided data of the desired precision. 2015 SBRM Amendment Appendix E-9.

90.     In designing its bycatch monitoring and reporting methodology to meet agency's low-end threshold level of precision, the Fisheries Services presumes full funding and staffing of the SBRM's observer monitoring program.

91.     Any shortfall in bycatch monitoring funding allocation needed to implement that methodology will inevitably cause the SBRM's monitoring precision to fall below the Fisheries Service's recommended precision range of 20 percent to 30 percent.

92.     Only an adequate SBRM budget ensures the minimum levels of precision for bycatch data collection and reporting. Nevertheless, the funding allocation scheme in the 2015 Final Rule limits the sources of funding for the SBRM program to four Congressional appropriations lines, regardless of whether funding from the selected appropriations lines is adequate for any given year. 80 Fed. Reg. at 37184; 2015 SBRM Amendment at 243.

93.     The 2015 Final Rule acknowledges that "historically, the available funding has been insufficient to fully fund the SBRM to meet the performance standard." 80 Fed. Reg. at 37184.

94.     The D.C. Circuit focused on the poor budgetary history in remanding the 2008 SBRM Amendment. The Fisheries Service's own analyses confirm that the new SBRM Amendment's observer allocation and prioritization methodology will not improve the chronic underfunding of the SBRM, or circumscribe the Fisheries Service's discretion. Indeed, the Fisheries Service's data project that the SBRM Amendment process will fall short of the needed funds by 30 percent in 2015–2016, the first year operating under the newly formalized Amendment. Fisheries Service, *Standardized Bycatch Reporting Methodology Annual Discard Report with Observer Sea Day Allocation* (2015).

95.     In responding to one commenter raising concerns about the risk that the SBRM observer program will be underfunded, the Fisheries Service conceded that "commenters are correct that in any given year, the costs to fully implement the observer coverage levels calculated through the SBRM proposed in this amendment may exceed available funding provided by Congress," but responded that "it would be premature to establish *nondiscretionary* priorities in this amendment, as management and scientific needs can and do change with time." 2008 SBRM Amendment Appendix at E10 (emphasis added).

96.     In any year where the four appropriation lines fail to meet the budgetary needs of the SBRM, the Fisheries Service prioritization process does nothing to make up for the shortfall and instead spreads the insufficient resources around more thinly, based on a "non-discretionary formulaic processes for prioritizing how the available observer sea-days would be allocated to the various fishing modes." 80 Fed. Reg. at 37184; 2015 SBRM Amendment at 248.

97.     Contrary to the purportedly non-discretionary nature of the re-allocation process, the Fisheries Service could elect to use other sources of discretionary funding as well as industry funding mechanisms that ensure that its statutorily-mandated standardized bycatch reporting methodology has the funding needed to meet minimum standards of precision:  "The Agency is not contending that it has no discretion in how to spend any other funding lines, or that there are no other funding lines that may be available to support other monitoring priorities in the Region. The Fisheries Service must maintain some flexibility to use appropriated funding to respond to appropriations changes and changes in conditions and priorities within the Region and across the country." 80 Fed. Reg. at 37187.

98.     So in reality, the 2015 Final Rule grants the Fisheries Service vast budgetary discretion over the SBRM. The 2015 Final Rule acknowledges that "[i]f additional funds for

observer sea days were available from another funding source, not listed here, those observer sea days *could be allocated according to other priorities and would not necessarily be allocated according to the SBRM process.*" 2015 SBRM at 243 (emphasis added).

99.  The 2015 Rule underfunds the SBRM program and then reserves to the Fisheries Service complete discretion as to whether to allocate additional funding to SBRM as it sees fit. The Fisheries Service has, yet again, "reserve[d] to itself effectively complete discretion to trigger an exemption." *See Oceana III*, 670 F.3d at 1242.

100.  The Fisheries Service declined to allocate, or even consider, the resources needed to meet its own standard for minimum precision and performance. The revised SBRM process remains arbitrary, capricious, and contrary to law. The D.C. Circuit summed up the problem with the Fisheries Service's 2008 proffer of an "optional" SBRM standard reliant on the agency's internal funding priorities:

> To Oceana's argument that "key elements" of the methodology, including the standard of precision, are in fact "optional" because the agency may disregard them at will, the agency has responded, in effect, that the key elements and the methodology as a whole are binding upon it—except of course in the years when they are not. *See*, e.g., Govt. Br. at 26 ("The methodology does not change if funding is insufficient"). The agency appears to mean the methodology is "established" in some Platonic sense, serving as the model to which the agency will aspire, though it is never itself fully realized. (Ah, but a man's reach should exceed his grasp, or what's a heaven for?) Here we must agree with Oceana: *The "prioritization process" is the exception that proves this rule and shows it is not a rule at all.*

*Oceana III*, 670 F.3d at 1242 (emphasis added).

## III.   THE 2015 FINAL RULE VIOLATES FUNDAMENTAL REQUIREMENTS OF NEPA AND THE APA.

101.    NEPA regulations and the Fisheries Service's guidelines provide that the

significance of an action "must be analyzed in several contexts such as society as a whole

(human, national), the affected region, the affected interests, and the locality." 40 C.F.R. §

1508.27; Fisheries Service, *Guidelines for the Preparation of FONSI: Instruction 30-124-1* (July

22, 2005). The regulations and guidelines further provide that the Fisheries Service must weigh

the action against eleven specific significance criteria.

102.    Commenters raised significant concerns regarding the potential cumulative

impacts of the 2015 SBRM Amendment and the associated observer funding mechanism with

respect to current and future fisheries management and conservation efforts. *See,* e.g., Oceana

2015 Comments at "Far from being "procedural" in nature, the policies being established in the

Omnibus Amendment will have a direct and substantive impact on the Fisheries Service's ability

to recognize, and thus, prevent, overfishing, as mandated under federal law. The Fisheries

Service's policy relates directly to the amount of uncertainty in catch and stock size, which

relates directly to the risk of overfishing – so a proximate impact is the risk of overfishing, so the

environmental impacts are actually significant."

103.    The 2015 FONSI repeatedly dismisses and postpones reasonably foreseeable

impacts by characterizing them as "remote" and "speculative" results of separate actions. *See*

2015 SBRM Amendment at 290. ("[B]ecause these types of potential management actions,

which may eventually stem from implementation of the SBRM, are too remote and speculative

to be adequately or meaningfully addressed in this amendment, this NEPA analysis focuses

solely on the potential direct, indirect, and cumulative effects expected to be immediately

associated with the proposed action and primary alternatives. Any future management actions that may result from the information collected under this SBRM would be subject to all the requirements of NEPA at the appropriate time.").

104.    The 2015 FONSI downplayed the significance of the new SBRM policy and, thereby, avoided addressing the impacts of the SBRM. The FONSI repeatedly dismissed the action as "largely," "purely," "wholly," or "entirely" "administrative in nature," with no potential for direct or indirect or adverse impacts on the environment, on regulated entities, on the public health, the environment or economy. *See* e.g., 2015 SBRM at 297, 318, 322, 326, 327, 328, 329, 331, and 333.

105.    The Fisheries Service's responses to comments refute its characterization of the SBRM policy as administrative in nature. For example, the Cape Cod Commercial Fishermen's Alliance ("Alliance") expressed concern that the SBRM's prioritization process would hinder efforts to develop alternative monitoring solutions (including electronic monitoring), eliminate supplemental observer coverage on midwater trawl vessels fishing in groundfish closed areas, and put the Northeast multispecies sector system at risk due to its heavily reliance on appropriate monitoring. 80 Fed. Reg. at 37,184-85. In response, the Fisheries Service conceded that the "[t]he SBRM Omnibus Amendment may result in the unavailability of the funds previously used for this coverage because the funds must first go to the SBRM requirements. . . . *Accordingly, without funds to provide this supplemental observer coverage, fewer midwater trawl trips will have access to these areas." Id.* at 37185 (emphasis added). The Fisheries Service went on to acknowledge that "[t]he impacts of this change on other monitoring priorities are real and will require adjusting expectations and evaluating whether other sources of funding for these priorities may be possible." *Id.*

106.    These and other responses to comments in the 2015 Final Rule underscore and concede the fact that the SBRM Amendment will have substantive impacts on the Fisheries Service's operations and capabilities.

107.    The Fisheries Service also concedes in the Final Rule that it had recognized the potential effect of the proposed SBRM funding trigger on available SBRM coverage and other monitoring programs previously funded by the affected funding lines as early as April 2014, well before it issued its 2015 FONSI. *Id.* at 37188.

108.    Publicly-available government records confirm that in April 2014, NOAA staff briefed the Mid-Atlantic Fishery Management Council and New England Fishery Management Council on the potential implications of the new funding scheme, specifically noting that funding lines previously used for the National Observer Program and the Atlantic Herring Closed Area would be diverted to the SBRM program under the Amendment. *See* Fisheries Service, Presentation Before the Mid-Atlantic Fishery Mgmt. Council (April 10, 2014), 17–18 (indicating that, under the SBRM Amendment, Observer Sea Days allocated to At Sea Monitoring ("ASM") would fall from 6,228 to 475, and Observer Sea Days allocated to the Atlantic Herring Closed Area would fall from 646 to 0).

109.    In response to another commenter, the Fisheries Service conceded that "the funding-related prioritization trigger may require some funding sources that have previously been used to support development of electronic monitoring to be used exclusively for the SBRM. This may delay implementation of electronic monitoring in the Region." 80 Fed. Reg. at 37190 (emphasis added).

110.    The Fisheries Service's predictions undermine boilerplate assertions that the SBRM program is merely "administrative in nature."

IV.  . **THE FISHERIES SERVICE FAILED TO UPDATE ITS 2007 ANALYSIS AND CONSIDER CURRENT ALTERNATIVES UNDER NEPA FOR THE 2015 SBRM.**

111.    On remand, the Fisheries Service declined to review its 2008 SBRM policy based on new data and commenter concerns under NEPA and the APA. The Fisheries Service chose instead to rely on its 2007 analysis, stating that "[b]oth Councils directed the plan development team for this action specifically to focus on the legal deficiencies identified by the Court of Appeals and some minor revisions suggested by the 3-year review report." 80 Fed. Reg. at 37,187.

112.    The Final Rule attests to the dramatic changes resulting from the D.C. Circuit decision and concedes that it will change the status quo: "This [Rule] is a direct result of efforts to address the specific finding of the U.S. Appeals Court in *Oceana v. Locke* that the Agency had too much discretion to determine the available funding for SBRM. The impacts of this change on other monitoring priorities are real and will require adjusting expectations and evaluating whether other sources of funding for these priorities may be possible." Final Rule at 37185.

113.    The fisheries industry has experienced profound technological and economic developments since the 2007 FONSI. These developments include advancements in electronic monitoring technology, reductions in electronic monitoring capital and operating costs, and adoption of electronic monitoring as a regulatory tool by other fisheries.

114.    Both the 2007 SBRM Amendment and the 2015 SBRM Amendment cited heavily to a 2006 study providing cost and utilization information on electronic monitoring equipment. The citations specifically included the study's conclusion that "total costs of an electronic monitoring program currently may equal or surpass the cost of an onboard observer program— particularly in light of the startup costs associated with a new program." 2007 SBRM

Amendment at 214; 2015 SBRM Amendment at 142, 259, and 292-294 (citing Kinsolving, 2006).

115.    The 2015 SBRM Amendment fails to acknowledge a subsequent study published in 2009 by the same author, which concluded that electronic monitoring equipment could be *cheaper than observers* for vessels fishing during more than 30% of the monitoring equipment rental days where the vessel was fishing, or for vessels using electronic monitoring equipment in lieu of an observer during more than seven fishing days a year. *See* Julie Bonney, et al., *Continued Assessment of an Electronic Monitoring System for Quantifying At-Sea Halibut Discards in the Central Gulf of Alaska Rockfish Fishery, EFP 08-01 Final Report,* Alaska Groundfish Data Bank (2009).

116.    Since 2007, NOAA and the Fisheries Services conducted extensive new research and issued guidance on the use of electronic monitoring equipment, and imposed electronic monitoring equipment requirements in some fisheries.

117.    Fisheries Service policy recognizes that "[b]etter information regarding the portion of the fleet without observers, perhaps through the use of electronic monitoring (e.g., digital video cameras or digital observers) and electronic logbooks, would be helpful in improving the estimates of total bycatch." National Approach Memo at 46.

118.    The Fisheries Service noted in 2013 that "[t[he most effective use of resources may result from a design that combines new [electronic monitoring/electronic reporting] approaches with existing approaches such as VMS, dockside monitors, observers and logbooks maintained by dealers or processors that can be integrated into a single fishery information system." The Fisheries Service, *Electronic Monitoring and Electronic Reporting: Guidance &*

*Best Practices for Federally-Managed Fisheries (Best Practices Report)* 31 (2013) ("Best

Practices Report").

**FIRST CLAIM FOR RELIEF**

**THE FISHERIES SERVICE FAILED TO ESTABLISH A STANDARDIZED BYCATCH
REPORTING METHODOLOGY UNDER THE MAGNUSON-STEVENS ACT AND THE
ADMINISTRATIVE PROCEDURE ACT**

119.    Plaintiff realleges and incorporates by reference the allegations of paragraphs 1-

118 in this First Claim for Relief.

120.    In order to "establish" a standardized bycatch reporting methodology under the

Magnuson-Stevens Act and APA, the 2015 SBRM Amendment must provide statistically

reliable data on "the amount and type of bycatch in each fishery in each region" and "the

[Fisheries Service] must fund enough observer voyages to generate statistically reliable data,"

defined under the 2015 SBRM Amendment as data "sufficient to produce a coefficient of

variation (CV) of the discard estimate of no more than 30 percent." *Oceana III*, 670 F.3d 1239-

1240.

121.    The SBRM failed to establish a standardized bycatch reporting methodology to

report the amount and type of bycatch in the fishery, because the SBRM does not apply its

methodology, including its performance standard, to important non-target species that are

targeted in state fisheries, such as striped bass and shad.

122.    The SBRM failed to establish a standardized bycatch reporting methodology

because the SBRM does not require the Regional Administrator to comply with its performance

standard for allocating at-sea observer coverage levels because it limits the source of budgeted

funds to levels below the levels needed historically and prospectively to meet the 30 percent CV

performance standard.

35

123.    The 2015 SBRM Amendment failed to establish a standardized bycatch reporting methodology because it impermissibly provides the Fisheries Service with an "escape hatch" from its obligation to provide the funding needed to ensure compliance with the SBRM's minimum precision standard, in the form of the artificially restrictive set of appropriations streams available to fund observer monitoring.

124.    The agency's deliberate and calculated underfunding of the SBRM Program and observer allocation process is an abuse of discretion and contrary to law.

125.    The 2015 Final Rule and SBRM failed to establish a standardized bycatch reporting methodology when it limited the Fisheries Service's obligation to consider observer bias on SBRM funding requirements based on an ambiguous "practicability" qualifier not found in the statute, and expressly rejected by the DC Circuit in *Oceana III*.

126.    Accordingly, by approving the SBRM, the Fisheries Service violated the Magnuson-Stevens Act and the APA.

## SECOND CLAIM FOR RELIEF

**THE 2015 SBRM AMENDMENT IS ARBITRARY AND CAPRICIOUS, ABUSES THE AGENCY'S DISCRETION, AND EXCEEDS THE AGENCY'S STATUTORY AUTHORITY UNDER THE APA, MAGNUSON-STEVENS ACT, AND NEPA.**

127.    Plaintiff realleges and reincorporates by reference the allegations of paragraphs 1-126 in this Second Claim for Relief.

128.    Section 553 of the APA requires the Fisheries Service to consider and respond to comments that are material to issues which, if true, would require a change in the rule. 5 U.S.C. 553(c).  *La. Fed. Land Bank Ass'n, FCLA v. Farm Credit Admin.*, 336 F.3d 1075, 1080 (D.C. Cir. 2003).

129.    The Fisheries Service exceeded its legal authority under the Magnuson-Stevens Act, the APA, and NEPA when it acquiesced to the Council's directive to make "the primary

scope of this action to specifically focus on the Court's remand" and when it adopted a policy that "alternatives previously considered but rejected in the 200[8] amendment were deemed considered and rejected for this action." 80 Fed. Reg. at 37,187 (emphasis added).

130.    The Fisheries Service's overly narrow interpretation of the 2015 SBRM Rule's scope is unsupported by the facts, the text of the 2015 SBRM Amendment, and the agency's acknowledgment in the preamble that "[t]his rule implements approved management measures contained in the Standardized Bycatch Reporting Methodology Omnibus Amendment to the fishery management plans of the Greater Atlantic Region, developed and submitted to NMFS by the Mid-Atlantic and New England Fishery Management Councils." 2015 SBRM Rule at 37182.

131.    The 2015 SBRM Amendment abuses the Fisheries Service's rulemaking discretion by selecting an overly narrow and historically insufficient set of appropriation funding streams to feed the SBRM process, effectively guaranteeing that future SBRM funding will fail to meet the CV precision goal without a decision by the Fisheries Service to exercise its budgetary discretion and allocate funding from other sources.

132.    In declining to reconsider the merits of comments and alternatives first raised and rejected in 2008, the Fisheries Service arbitrarily and capriciously presumed that the agency's review and analysis of data, facts, and policy from an eight-year old, vacated rulemaking's environmental assessment could substitute for reasoned consideration and analysis of comments and recommended alternatives submitted in response to the 2015 SBRM Amendment.

133.    The 2015 SBRM Rule's assertion that the Fisheries Service conducted the reasoned analysis necessary to conclude that "commenters offer no new information or circumstances that show these alternatives should have not been rejected from further consideration for this action," id. at 37,186, runs counter to the evidence in the record, including

Fisheries Service's admission that it summarily rejected any alternative "previously considered but rejected in the 2007 amendment[.]" *Id.* at 37,187.

134.    The Fisheries Service failed to give reasoned consideration to commenters' data and documentation governing bias, as required under section 553 of the APA, and its acknowledged reliance on its 2008 assessment of Oceana's claims and the 2010 findings of a District Court with respect to a remanded rule is arbitrary, capricious, and an abuse of discretion.

135.    The Fisheries Service's assertions that "the effect of observer bias is expected to be small" and that "the 'observer effect' is not expected to contribute to the variance in the observer data" is arbitrary and capricious, contrary to the facts before the agency, and so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

136.    The Fisheries Service failed to adequately respond to the comments of Oceana and other commenters raising many significant technical and legal flaws in the SBRM Amendment and the rulemaking process itself.

137.    The Fisheries Service had a duty under the Magnuson-Stevens Act to consider observer bias in its SBRM where commenters and its own documentation indicated that observer bias could bring the statistical reliability of SBRM data below the 2015 SBRM Amendment's precision standard.

138.    The Fisheries Service violated section 301 and 303 of the Magnuson-Steven's Act and section 706 of the APA when it failed to consider or respond to documentation provided by commenters demonstrating the potential for observer bias at levels that could impair the "statistically reliability" of information collected under the SBRM.

139.    The SBRM alternatives analysis applies an outdated understanding of how fisheries function and are regulated, disregarding now common regulatory practices like Annual Catch Limits and Accountability Measures and the need for stock-level bycatch information, and is contrary to the facts before the Agency.

140.    The SBRM's Failure to Articulate a Rational Methodology Under the APA to explain its selection of non-discretionary SBRM funding sources and procedures and observer allocation procedures "funding triggers" lack a rational methodology and fail to resolve issues previously raised by the D.C. Circuit and Oceana.

141.    The Agency failed to conduct an adequate alternative analysis for SBRM funding and allocation, as needed to support its selection of non-discretionary SBRM funding source or observer allocation prioritization procedures under NEPA.

142.    The Environmental Assessment fails to meet statutory requirements under NEPA, the Magnuson-Stevens Act, and the APA.

143.    The Fisheries Service's failure to provide a scientific basis for its choice of a 30 percent CV, and its failure to consider other reasonable alternatives to the 30 percent CV are arbitrary and capricious under the APA, and violate NEPA's hard look rule.

## THIRD CLAIM FOR RELIEF

**THE FISHERIES SERVICE'S RELIANCE ON AN EA AND FONSI WAS ARBITRARY AND CAPRICIOUS, AN ABUSE OF DISCRETION, AND VIOLATED NEPA AND THE APA.**

144.    Plaintiff realleges and reincorporates by reference the allegations of paragraphs 1-143 in this Third Claim for Relief.

145.    NEPA requires federal agencies to prepare an environmental impact statement when undertaking or funding "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C.A. § 4332(2)(C). While an agency can prepare an EA to

determine whether the action will have a significant effect on the environment, if, in light of the EA, the agency determines that its action will significantly affect the environment, then an EIS must be prepared. 40 C.F.R. § 1501.4. If an agency decides not to prepare an EIS, it must supply a convincing statement of reasons to explain why a project's impacts are insignificant." *Blue Mts. Biodiversity Project v. Blackwood,* 161 F.3d 1208, 1212 (9th Cir. Or. 1998) (internal quotations omitted). "The statement of reasons is crucial to determining whether the agency took a 'hard look' at the potential environmental impact of a project." *Id.* As part of that hard look, NEPA's implementing regulations require an agency to evaluate 'cumulative impacts' along with the direct and indirect impacts of a proposed action." *TOMAC v. Norton,* 433 F.3d 852, 860, 864 (D.C. Cir. 2006)

146.    The SBRM will have far-ranging and fundamental indirect and cumulative impacts on the environment because the data collected pursuant to its methodology will form the scientific basis for major conservation and management decisions in all Northeast United States federal fisheries, including decisions concerning the total allowable catch.

147.    The FONSI violates NEPA's cumulative impact assessment requirement by dismissing or ignoring reasonably foreseeable impacts and as remote and speculative separate actions.

148.    The Fisheries Service's assertions that "[t]he purpose of this action is not to directly or even indirectly alter fishing practices or levels of fishing effort" and "does not directly or indirectly affect the physical environment" SBRM Amendment Appendix E13, are contradicted by the 2015 Final Rule's admission that "the impacts of [the 2015 SBRM Amendment] on other monitoring priorities are real and will require adjusting expectations and evaluating whether other sources of funding for these priorities may be possible," Final Rule at

37185, and, is thus, arbitrary and capricious by running counter to the evidence before the Agency.

149.   The SBRM EA and FONSI failed to consider the cumulative impacts the SBRM would have together with subsequent management decisions that would rely on the data collected pursuant to the SBRM. 2015 SBRM Amendment at 318.

150.   The SBRM EA and FONSI, by failing to consider the role of data collection as the basis for subsequent fishery management measures, failed to take a hard look at whether the SBRM might reasonably be expected to jeopardize the sustainability of target or non-target species. *Id.* at 327-328.

151.   The SBRM EA and FONSI, by failing to consider the role of data collection as the basis for subsequent fishery management measures, failed to take a hard look at whether the SBRM might reasonably be expected to adversely affect threatened or endangered species. *Id.* at 329.

152.   The 2015 SBRM EA and FONSI, by failing to consider the role of data collection as the basis for subsequent fishery management measures, failed to take a hard look at whether the SBRM might reasonably be expected to result in significant social or economic impacts.

153.   The SBRM EA and FONSI, by failing to consider the role of data collection as the basis for subsequent fishery management measures, failed to take a hard look at whether the SBRM might reasonably be expected to have a substantial impact on biodiversity and/or ecosystem function within the affected area.

154.   The SBRM EA and FONSI, by failing to consider the role of data collection as the basis for subsequent fishery management measures, failed to take a hard look at whether the

effects of the SBRM are likely to be highly uncertain or involve unique or unknown risks. *Id.* at 265.

155.    The SBRM EA and FONSI, by failing to consider the role of data collection as the basis for subsequent fishery management measures and the implications of the *Oceana III* Court's rejection of the Fisheries Service's existing policy with respect to SBRM funding and prioritization, failed to take a hard look at whether the SBRM might reasonably be expected to threaten a violation of Federal, State, or local law or requirements imposed for the protection of the environment.

156.    Accordingly, the Fisheries Service's reliance on a limited EA and FONSI to support this major agency action is arbitrary and capricious, in violation of NEPA and the APA.

## PRAYERS FOR RELIEF

1.    Enter a declaratory judgment that the 2015 SBRM Amendment and 2015 Final Rule violated the Magnuson-Stevens Act and the APA and that the EA/FONSI violated NEPA and the APA.

2.    Remand the 2015 SBRM Amendment, the 2015 Final Rule, and the EA/FONSI to the Fisheries Service to develop a new SBRM and NEPA analysis that complies with the Court's order.

3.    Enter an order awarding Oceana its fees, expenses, and costs.

4.    Provide such other and further relief as the Court deems necessary, just, or proper.

Dated this 29th day of July, 2015

Respectfully Submitted

_____

Charles L. Franklin
DC Bar No. 485272
Akin Gump Strauss Hauer & Feld, LLP
Washington, DC 20036

_____

Paul E. Gutermann
DC Bar No. 358332
Akin Gump Strauss Hauer & Feld, LLP
Washington, DC 20036