**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
　　　　　　　　　　　　　　　　　)
OCEANA, Inc.,　　　　　　　　　　)
　　　　　　　　　　　　　　　　　)
　　　　　　Plaintiff,　　　　　　)
　　　　　　　　　　　　　　　　　)
　　　　v.　　　　　　　　　　　　)　No. 1:15-cv-01220-ESH
　　　　　　　　　　　　　　　　　)
WILBUR ROSS, JR., in his official capacity　)
as Secretary of the United States Department　)
of Commerce, *et al.*,　　　　　　)
　　　　　　　　　　　　　　　　　)
　　　　　　Defendants.　　　　　　)
_____)

## MEMORANDUM OPINION

As part of its efforts to prevent overfishing, Congress has directed the National Marine

Fisheries Service and regional councils to establish methodologies for collecting and reporting data

on fish that are caught but subsequently discarded. Such discards are known as bycatch. In

response to the congressional directive, the Northeast region adopted its Standardized Bycatch

Reporting Methodology in 2015. Oceana, Inc., a nonprofit organization focused on protecting the

oceans, claims that the adoption of this methodology violates the Magnuson-Stevens Act (MSA),

the National Environmental Policy Act (NEPA), and the Administrative Procedure Act (APA).

Defendants and Oceana have filed cross-motions for summary judgment. For the reasons that

follow, the Court will deny Oceana's motion and grant defendants' motion.

**BACKGROUND**

To provide context for this case, the Court must introduce the reader to the world of fisheries regulation and the history of bycatch reporting methodologies in the Northeast region. First, the Court will explain the role of bycatch in the fishing industry and the statutory framework for regulating it. Next, the Court will provide a summary of the Northeast region's prior attempts to establish a standardized bycatch reporting methodology and the litigation surrounding those attempts. Finally, the Court will outline the elements of the current methodology and Oceana's challenges to it.

**I.      CONGRESS REQUIRES A STANDARDIZED BYCATCH REPORTING METHODOLOGY (SBRM)**

Fishermen and fishing vessels do not always keep every fish that they catch. "[F]ish which are harvested . . . but which are not sold or kept for personal use" are called "bycatch." 16 U.S.C. § 1802(2). There are a variety of reasons for discarding fish. Economic discards occur when fish are "of an undesirable size, sex, or quality, or for other economic reasons." *Id.* § 1802(9). Regulatory discards are fish discarded because they are of a type that "fishermen are required by regulation to discard whenever caught, or are required by regulation to retain but not sell." *Id.* § 1802(38). Although fishing vessels may return fish to the water, the phenomenon of bycatch is important because some discarded fish do not survive. (*See* Administrative Record ("AR") 6472-73.)

The National Marine Fisheries Service (NMFS) regulates bycatch and other aspects of fishing based on the directives in the Magnuson-Stevens Fishery Conservation and Management Act, 16 U.S.C. §§ 1801 *et seq.* ("MSA"). The purpose of the MSA is to "promote domestic commercial and recreational fishing" while also "conserv[ing] and manag[ing] the fishery resources." *Id.* § 1801(b). To implement those goals, the MSA establishes eight Regional Fishery

Management Councils, which are responsible for developing Fishery Management Plans (FMPs) for their regions. *Id.* § 1852. There must be a plan for each fishery, which consists of "one or more stocks of fish which can be treated as a unit for purposes of conservation and management and which are identified on the basis of geographical, scientific, technical, recreational, and economic characteristics." *Id.* §§ 1802(13), 1852(h). The Secretary of Commerce is responsible for approving FMPs and FMP amendments after public notice and comment, and the Secretary promulgates final regulations as necessary to implement the FMPs. *Id.* §§ 1802(39), 1853(c), 1854(a), (b). NMFS performs these duties on behalf of the Secretary. *Oceana, Inc. v. Locke*, 831 F. Supp. 2d 95, 101 (D.D.C. 2011).

Congress has established certain requirements for FMPs. 16 U.S.C. § 1853(a). They must include, inter alia, "conservation and management measures . . . necessary and appropriate for the conservation and management of the fishery, to prevent overfishing and rebuild overfished stocks, and to protect, restore, and promote the long-term health and stability of the fishery." *Id.* § 1853(a)(1). They must "assess and specify the present and probable future condition of, and the maximum sustainable yield and optimum yield from, the fishery," "specify objective and measurable criteria for identifying when the fishery . . . is overfished," and "establish a mechanism for specifying annual catch limits . . . at a level such that overfishing does not occur in the fishery, including measures to ensure accountability." *Id.* § 1853(a)(3), (10), (15). The provision at issue in this case requires FMPs to "establish a standardized reporting methodology to assess the amount and type of bycatch occurring in the fishery, and include conservation and management measures that, to the extent practicable and in the following priority — (A) minimize bycatch; and (B) minimize the mortality of bycatch which cannot be avoided." *Id.* § 1853(a)(11). Bycatch reporting is necessary to understand the scope of bycatch problems and to make sound fisheries management

decisions.  (AR 6473.)

## II.     PRIOR ATTEMPTS TO ESTABLISH AN SBRM

The Mid-Atlantic and New England Fishery Management Councils have made several

attempts to establish standardized bycatch reporting methodologies to satisfy the requirements of

the congressional directive.  Initially, they adopted different methodologies in amendments to

individual FMPs.  Amendment 13 to the Northeast Multispecies FMP purported to establish an

SBRM for that fishery.  *See Oceana, Inc. v. Evans*, Civ. No. 04-811, 2005 WL 555416 (D.D.C.

Mar. 9, 2005) ("*Oceana I*").  Amendment 13 endorsed the use of at-sea fishery observers —

scientists who board fishing vessels to record discards during the fishing trip — to obtain data from

a sample of fishing trips.  *Id.* at *38; *see Oceana, Inc. v. Locke*, 725 F. Supp. 2d 46, 50 n.10

(D.D.C. 2010) ("*Oceana III*"), *rev'd*, 670 F.3d 1238 (D.C. Cir. 2011).  In the amendment, the

Council stated that it "desire[d] 10 percent observer coverage."  *Oceana I*, 2005 WL 555416, at

*38.  In response to comments, the final rule stated that NMFS "intend[ed] to maintain its observer

coverage . . . at a minimum level of 5 percent."  *Id.*  Noting that the level of observer coverage was

subject to change at the whim of the Secretary, this Court held in 2005 that "an FMP that merely

suggests a hoped-for result . . . does not measure up to the statute's requirements."  *Id.* at *39-40.

The Court also found that the amendment did not contain any new methodology and disregarded

the best scientific information available.  *Id.* at *39-42.  Therefore, it remanded Amendment 13 to

the agency for further action to address the bycatch monitoring requirement of the MSA.  *Id.* at

*43.

At about the same time, the Court also considered the adequacy of Amendment 10 to the

Atlantic Sea Scallop FMP.  *See Oceana, Inc. v. Evans*, 384 F. Supp. 2d 203 (D.D.C. 2005)

("*Oceana II*").  Amendment 10 proposed to fund a live observer program by setting aside one

percent of the total allowable catch and days at sea, so that fishing vessels required to carry an observer could use the extra fishing allotment to cover the costs of the observer. *Id.* at 232 & n.37. As for how those vessels would be chosen, the amendment said only that "[t]he Regional Administrator will determine the number of sea sampled trips and distribution by gear and area, taking into account the desired level of sea sampling needed to estimate bycatch with an accuracy appropriate to the scallop [fishery] at which the bycatch information will affect management decisions. As such, it would be appropriate for sea sampling intensity to favor areas of higher than average groundfish and turtle bycatch." *Id.* at 233. This Court held that Amendment 10 violated the MSA because it did not set forth any program for obtaining reliable estimates of bycatch. *Id.* at 232-34. Instead, it assigned that task to the Regional Administrator and gave him complete discretion. *Id.* As with Amendment 13, the Court also found that the agency had failed to consider the best scientific information available. *Id.* at 235-36. Thus, in 2005 the Court remanded the bycatch reporting aspect of Amendment 10 as well. *Id.* at 256.

NMFS responded to the remand orders in *Oceana I* and *II* by developing the Northeast Region Omnibus SBRM Amendment, which was implemented in 2008 and set out bycatch reporting procedures to apply to all thirteen fisheries in the Northeast region. *Oceana III*, 725 F. Supp. 2d at 51. The 2008 SBRM described a methodology to allocate observers to vessels so that the data collected would be sufficient to produce bycatch rates with a particular level of precision. *Id.* at 54. Specifically, it measured precision as a coefficient of variation (CV) that decreases with increasing precision, and it stated that the CV would be 30 percent or lower for each species or species group. *Id.* at 54 & n.13. However, if "external operational constraints" prevented NMFS from fully implementing the required observer coverage levels, the Regional Administrator would consult with the councils to determine an appropriate prioritization for available resources. *Id.* at

54-55. The Administrator could consider data needs for stock assessments or management actions, legal mandates, "and/or any other criteria identified by NMFS and/or the Councils." *Id.* This Court rejected Oceana's legal challenges to the 2008 SBRM, *id.* at 72, but the D.C. Circuit reversed and directed this Court to remand the matter to the agency, *Oceana, Inc. v. Locke*, 670 F.3d 1238, 1243 (D.C. Cir. 2011) ("*Oceana III (Appeal)*"). The D.C. Circuit held that NMFS had failed to establish a standardized methodology because it "reserve[d] to itself effectively complete discretion to trigger an exemption" from the methodology that it had described, and there was no meaningful constraint on how the agency would allocate observers once the exemption was triggered. *Id.* at 1241-43.

## III. 2015 SBRM OMNIBUS AMENDMENT

Following the remand of the 2008 SBRM, NMFS and the councils revised the methodology to address the D.C. Circuit's concerns. In March 2015, NMFS approved a new version of the SBRM, which is set forth in *Standardized Bycatch Reporting Methodology: An Omnibus Amendment to the Fishery Management Plans of the Mid-Atlantic and New England Regional Fishery Management Councils*, AR 6438-7511. NMFS then promulgated a final rule implementing the amendment in June 2015. *See* Magnuson-Stevens Fishery Conservation and Management Act Provisions; Fisheries of the Northeastern United States; Standardized Bycatch Reporting Methodology Omnibus Amendment, 80 Fed. Reg. 37182 (June 30, 2015) (codified at 50 C.F.R. pt. 648) ("Final Rule"). This 2015 SBRM is the one that Oceana challenges here. To comprehend Oceana's challenges and this Court's decision, it is necessary to understand some basic features of the 2015 SBRM.

Like the previous SBRMs, the 2015 SBRM relies on placing at-sea observers on some, but not all, fishing trips. (*See* AR 6443-44, 6480-81, 6594-95, 6685-86.) Observers are biologists who

record the amount of catch and bycatch to the lowest taxonomic level possible.  (AR 6594-95.)

NMFS also considered using electronic monitoring techniques but concluded that the technology

was not sufficiently developed to perform the complex data collection supplied by onboard human

observers.  (AR 6728-29.)  Because of the expense of human observers, they observe a sample of

fishing trips rather than all trips.  (*See* AR 6619-60, 6712-18.)

Much of the 2015 SBRM focuses on how to choose the sample of fishing trips to observe so

that the data collected will permit reliable estimates of bycatch rates.  For purposes of sampling

trips and calculating bycatch rates, the SBRM categorizes fishing trips into over forty fishing

modes based on the calendar quarter, geographical region, fishing gear type, mesh size, access area,

and trip category.  (AR 6623-25.)  Bycatch data from each fishing mode are used to calculate

bycatch rates for each of fifteen different species or species groups.  (AR 6703-04.)  Thus, the

SBRM aims to sample trips in each fishing mode to generate data that will support calculation of

bycatch rates for each combination of fishing mode and species or species group.  (*See id.*)

To determine how many trips to observe, the SBRM considers the precision of the data.

"Precision is defined as the degree of agreement of repeated measurements of the same quantity or

object."  (AR 6620.)  Assuming that measurements are not all biased in the same way, greater

precision will lead to greater accuracy (i.e., closeness between the measured value and the true

value).  (AR 6620-21.)  The SBRM uses a "standard measure of precision" called the coefficient of

variation (CV), which is "calculated as the ratio of the square root of the variance of the bycatch

estimate (i.e., the standard error) to the bycatch estimate itself."  (AR 6622 n.27.)  A high CV

means that the calculated bycatch estimate is not very precise, while a low CV indicates that the

estimate is very precise.  (*Id.*)  The SBRM describes methods for calculating how many fishing

days should be observed so that the CV of the bycatch estimate will not exceed a certain threshold.

(*See* AR 6637-60.)

The SBRM procedure for determining the number of observer days consists of first calculating the days required to achieve a CV standard of 30 percent and then applying several adjustments. The initial calculation is the number of observer days required in each fishing mode to attain a CV of no more than 30 percent for each combination of fishing mode and species group. (AR 6703-04.) Then, the days are adjusted using an importance filter that is "designed to 'weed out' particular combinations of fishing gear and bycatch species where the infrequency and variable amounts of discards would result in high observer sea day coverage levels, in spite of the fact that the actual magnitude and frequency of discards may be low and of small consequence to the discarded species . . . ." (AR 6691-6701.) The importance filter eliminates (1) fishing modes for a species that together contribute less than 95 percent of the cumulative discards of that species and (2) fishing modes for a species when the total discards of the species in those modes are less than 98 percent of the cumulative fishing mortality of that species. (AR 6696-6701.) As a result, the observer days for each fishing mode will be set by the needs of the species with the next highest observer day requirements, after some species are removed by the importance filter. (*Id.*) For example, suppose that 1000 days would be required to attain a 30% CV for all species in a particular mode but bluefish are eliminated because such a low proportion of their discards occur in that mode. If only 500 days are required to attain a 30% CV for all remaining species, the SBRM will assign only 500 days to that mode, instead of 1000. Thus, by design, the SBRM will not achieve a 30% CV for combinations of species and fishing mode that fall outside its thresholds for importance. (*See* AR 6691-6701.)

In addition to adjusting the observer days based on the importance filter, the SBRM also adjusts the days based on a prioritization process that depends on funding. The prioritization

process involves two steps: first, identifying the available funding for the SBRM, and second, eliminating lower-priority observer days until the total days can be covered by the available funding.  (AR 6712-16.)

The funding step incorporates a series of decisions by Congress and NMFS.  Congress appropriates a lump sum for the National Oceanic and Atmospheric Administration (NOAA) and uses an explanatory statement to specify the funding level for NMFS, including funding amounts for programs, projects, and activities (PPAs) within NMFS.  *See, e.g.*, Consolidated and Further Continuing Appropriations Act, 2015, Pub. L. 113-235, 128 Stat. 2130, 2178 (Dec. 16, 2014); Explanatory Statement, 160 Cong. Rec. H9343 (daily ed. Dec. 11, 2014).  NMFS allocates the funding from the congressional PPAs related to bycatch and observer coverage among its own, more detailed funding lines.  (*See, e.g.*, AR 7521-22.)  For the 2015 fiscal year, NMFS allocated most of the funding from the two related PPAs to seven regional observer funding lines (Atlantic Coast Observers, East Coast Observers, Hawaii Longline Observer Program, North Pacific Marine Resources Observers, Northeast Fisheries Observers, South Atlantic/Gulf Shrimp Observers, and West Coast Observers) and two observer funding lines that were not regionally specific (Reducing Bycatch—Observers, National Observer Program).  (*Id.*)[1]  NMFS decides how much funding from each of its funding lines goes to each region and how much to NMFS Headquarters.  (*See id.*)  All funding that NMFS allocates to the Northeast region from four specified funding lines (Northeast

[1] For 2015 Congress had specified that $43 million of the appropriation to NMFS was intended for the Observers/Training PPA and $3.5 million for Reducing Bycatch.  160 Cong. Rec. H9343.  The FY 2015 guidance from NMFS stated the amounts available for observer programs "after administrative and other costs have been subtracted."  (AR 7522 n.1.)  NMFS listed $40.7 million in total for the National Observer Program and the seven regional funding lines, a total which appears to correspond to the $43 million in Observers/Training, less administrative costs.  (*See id.*)  NMFS listed $0.65 million for Reducing Bycatch—Observers, which suggests that the agency dedicated the majority of the $3.5 million for Reducing Bycatch to bycatch programs other than observation.  (*See id.*)

Observers, Atlantic Coast Observers, National Observer Program, and Reducing Bycatch—Observers) must be used for the SBRM. (AR 6713.)[2] "[C]onsistent with historic practice," NMFS will deduct from those totals the costs for the SBRM other than observer days, as well as standard overhead costs, so not all of the specified funds will be converted to observer sea days. *Id.*; Final Rule, 80 Fed. Reg. at 37187-88.

If, in a particular year, the funds that NMFS allocates to the Northeast region from the four specified funding lines are not sufficient to cover the number of observer days calculated based on the 30% CV standard and the importance filter, the SBRM prescribes a prioritization process to determine how the available funding will be used. (AR 6713, 6715-16.) The goal is to prioritize observer sea days so as to minimize the number of combinations of fishing mode and species that have a CV higher than 30%. (AR 6715.) To accomplish that, the SBRM states that "the species group sea days needed would be organized in descending order within each fishing mode for all modes, and the highest difference in needed sea days between adjacent species groups within the

_____

[2] The SBRM states that the agency "would use funds allocated to the Region from these funding program lines to support SBRM consistent with historic practice." (AR 6713.) Likewise, the Final Rule states that "the amount of money available for the SBRM will be the funding allocated to the Region under four specific historically-appropriated observer funding lines (less deductions for management and administrative costs)." 80 Fed. Reg. at 37184. The Court asked the parties to explain why Appendix H to the SBRM, entitled "Prioritization Process Illustrative Examples," appeared to indicate that the agency could allocate some funds from the National Observer Program funding line to the region for At-Sea Monitoring, and that funding would not necessarily be governed by the SBRM. (*See* AR 7461, 7464; Order for Supp. Briefing at 2, ECF No. 33.) NMFS stated that the document "addresses the allocation of appropriated funds in FY2013, and thus it predates the allocation method described in the 2015 SBRM Amendment." (Defs.' Supp. Mem. at 5 n.3, ECF No. 34.) Given that the appendix is described as an illustration of the SBRM prioritization process, it is not clear to the Court whether the agency's description of a contradictory funding allocation was an error or whether the agency meant for the document only to illustrate the prioritization process for reallocating sea days, not to illustrate the SBRM's funding restrictions. Either way, the Court concludes that the Final Rule and the main text of the SBRM bind the agency to use all funding allocated to the region from the four specified funding lines to support the SBRM, after deduction of standard overhead costs.

fishing modes would be identified.  The sea days associated with the species group that represents

the highest number of observer sea days from that fishing mode would be removed . . . ."  (*Id.*)

Thus, the number of sea days for that mode would be the number required to achieve a 30% CV for

all species other than the one for which sea days were removed.  The elimination procedure is

repeated until the remaining sea days are within that year's funding limit.  (AR 6715-16.)  In sum,

the SBRM determines the number of observer days in each fishing mode by (1) calculating the

number required to achieve a 30% CV, (2) reducing the days according to the importance filter, and

(3) further reducing the days according to the funding-dependent prioritization process.

Oceana claims that the 2015 SBRM violates the MSA, APA, and NEPA.  (Compl. at 35-42,

ECF No. 1.)  Both Oceana and NMFS[3] have moved for summary judgment based on the

administrative record.  (Oceana Mot. Summ. J., ECF No. 26 ("Oceana Mot."); Defs.' Cross-Mot.

Summ. J., ECF No. 28.)  According to Oceana, NMFS did not establish an SBRM as required by

the MSA, because the 2015 SBRM fails to require NMFS to allocate sufficient funding to achieve

the 30% CV standard.  (Oceana Mot. at 12-17.)  Furthermore, Oceana argues that NMFS

improperly failed to reconsider several issues when it revised the 2008 SBRM to become the 2015

SBRM.  (*Id.* at 17-26.)  Specifically, Oceana challenges the agency's failure to reconsider

electronic monitoring and observer bias, as well its decision to restrict the methodology to federally

managed species.  (*Id.*)  In addition, Oceana contends that the agency's selection of 30 percent as

the CV standard was arbitrary.  (*Id.* at 26-27.)  Finally, Oceana argues that NMFS violated NEPA

by preparing an environmental assessment that ignores indirect and cumulative impacts on the

environment.  (*Id.* at 27-38.)

---

[3] The Court will refer to defendants (Wilbur Ross, Jr., NMFS, and NOAA) collectively as NMFS.

**ANALYSIS**

This Court rejects Oceana's challenges. The MSA does not bar NMFS from reserving some discretion about the funding of the SBRM, nor does it prevent NMFS from establishing a methodology that includes a method for adapting to the available funding. Oceana has failed to point to any superior evidence that NMFS failed to consider, and the agency's selection of the 30% CV standard was adequately justified. Furthermore, NMFS did not ignore reasonably foreseeable environmental impacts when it prepared the environmental assessment. Therefore, the Court will grant summary judgment to NMFS.

**I.      STANDARD OF REVIEW**

Challenges to agency action under the MSA, APA, and NEPA are all subject to the standard of review set forth in the APA. *See* 5 U.S.C. § 706 (APA); 16 U.S.C. § 1855(f) (MSA); *Baltimore Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 97-98 (1983) (NEPA). Under the APA standard of review, a court may hold agency action unlawful when it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2). For an agency action to survive review under this arbitrary and capricious standard, the agency must have "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). A court "may not supply a reasoned basis for the agency's action that the agency itself has not given," *id.* (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)), but it may "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned," *id.* (quoting *Bowman Transp. Inc. v. Arkansas-Best Freight Sys.*, 419 U.S. 281, 286 (1974)). When an agency's action involves "complex judgments about sampling methodology and data analysis that

are within the agency's technical expertise," a court gives those judgments "an extreme degree of deference." *Kennecott Greens Creek Min. Co. v. Mine Safety & Health Admin.*, 476 F.3d 946, 956 (D.C. Cir. 2007) (internal quotation marks and alterations omitted).

To review an agency's interpretation of a statute that it administers, courts apply the two-step test that the Supreme Court established in *Chevron U.S.A., Inc. v. NRDC*, 467 U.S. 837 (1984); *see Shays v. FEC*, 414 F.3d 76, 96 (D.C. Cir. 2005). "If the intent of Congress is clear, . . . the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842-43. If the statute is ambiguous, then the court must uphold an agency interpretation as long as it is "based on a permissible construction of the statute." *Id.* At this second step, the *Chevron* and APA standards both require the court to determine whether the agency's interpretation was reasonable. *See Shays*, 414 F.3d at 96-97; *Oceana III (Appeal)*, 670 F.3d at 1240.

## II.     ESTABLISHING A STANDARDIZED METHODOLOGY

Oceana argues that NMFS has failed to "establish a standardized reporting methodology" for bycatch, 16 U.S.C. § 1853(a)(11), because the 2015 SBRM does not require that NMFS allocate sufficient funding to achieve the 30% CV standard for all fishing modes and species. (Oceana Mot. at 12-17.) NMFS responds that there is no requirement that the agency fund the SBRM at any particular level, and it has established a standardized methodology by setting both a quantifiable funding trigger and a non-discretionary formula to distribute the funded observer days. (Defs.' Mem. Supp. Cross-Mot. Summ. J. at 14-20, ECF No. 28-1 ("Defs.' Mem.").) The Court agrees with NMFS that it has established a standardized methodology, notwithstanding its discretion about funding.

## A. Legal Standard

The parties' arguments require the Court to consider the intersection of two legal standards governing agency discretion — one regarding funding allocations and the other regarding departures from a generally applicable rule.  Therefore, the Court begins by outlining the relevant law as to each.

An agency's allocation of funds is unreviewable, unless Congress has restricted the use of the funds by statute.  *Lincoln v. Vigil*, 508 U.S. 182, 192-94 (1993).  "The allocation of funds from a lump-sum appropriation is [an] administrative decision traditionally regarded as committed to agency discretion" by law and therefore not subject to judicial review.  *Id.* at 192-93.  Decisions about how to distribute resources among programs require "complicated balancing of a number of factors which are peculiarly within [the agency's] expertise."  *Id.* at 193 (quoting *Heckler v. Chaney*, 470 U.S. 821, 831 (1985)).  Therefore, "as long as the agency allocates funds from a lump-sum appropriation to meet permissible statutory objectives," courts have "no leave to intrude."  *Id.*  Congress may circumscribe agency discretion by putting restrictions on funding in the appropriations act or establishing statutory entitlements in the substantive statute for which the appropriation is usable.  *Id.*; *Int'l Union, U.A.A.A.I.W. of Am. v. Donovan*, 746 F.2d 855, 861 n.5 (D.C. Cir. 1984).  But if it chooses not to do so, it is not a court's "responsibility to decree what 'reasonable' amounts should be expended on various programs."  *Id.* at 862-63; *see also Milk Train, Inc. v. Veneman*, 310 F.3d 747, 751-52 (D.C. Cir. 2002).

However, an agency's funding allocation may become reviewable if the agency chooses to make it the trigger that allows the agency to use a discretionary procedure instead of applying an otherwise applicable rule.  *See Oceana III (Appeal)*, 670 F.3d at 1241-43.  According to the D.C. Circuit, if Congress has required an agency to establish a procedure or standard and that agency

chooses to "reserve in advance some discretion to depart on a case-by-case basis," it "must adequately define the circumstances that 'trigger' the case-by-case analysis" and "set an 'identifiable standard' to guide its judgment when operating under that procedure." *Id.* at 1241 (internal citations omitted). Therefore, if the availability of funding is a trigger that exempts an agency from implementing its standardized methodology, the agency must "adequately define" the funding trigger rather than leaving it "impermissibly vague." *Id.* at 1241-42.

"The agency has broad discretion to use general terms for the 'trigger' and the 'identifiable standard,' . . . unless the statute requires the agency to be more specific . . . ." *Id.* at 1241. This is an "indulgent standard of review" but does not permit the agency to give itself "complete discretion." *Id.* Some examples will illustrate how the D.C. Circuit has applied its rule. In *Cement Kiln Recycling Coal. v. EPA*, 493 F.3d 207, 212-13 (D.C. Cir. 2007), the EPA issued regulations stating that facilities complying with the Clean Air Act MACT standards were not generally required to undergo a site-specific risk assessment (SSRA), but it reserved discretion to require an SSRA if a permitting authority concluded that compliance with the MACT standards alone might not be protective of human health or the environment.[4] The D.C. Circuit upheld the EPA's reservation of discretion because the regulation provided a specific, nine-factor test which both guided the agency's discretion about when to trigger the SSRA requirement and provided an identifiable standard to constrain the agency's discretion in applying the additional requirement. *Id.* at 217-23.

In contrast, the D.C. Circuit rejected reservations of discretion in two cases where agencies gave themselves complete discretion to trigger an exemption and complete discretion about how to

---

[4] MACT standards are emission standards that the EPA determines based on the "maximum achievable control technology" for hazardous air pollutants. *Id.* at 212.

operate under the exemption. The 2008 SBRM stated that if funding constraints prevented NMFS from fully implementing the standardized methodology, NMFS could determine the most appropriate way to assign observers based on its data needs and statutory obligations. *Oceana III (Appeal)*, 670 F.3d at 1242. The D.C. Circuit explained that this alternative procedure left NMFS with virtually complete discretion in the assignment of observers. *Id.* In addition, NMFS had complete discretion to trigger the alternative procedure, because it determined how much funding to allocate to bycatch observation. *Id.* As a result, the "exception [is] so vague as to make the rule meaningless." *Id.* at 1241. Similarly, the D.C. Circuit rejected the TSA's attempt to reserve discretion to depart from a prioritization list for reimbursing airport security projects, which Congress had required the TSA to establish. *Am. Airlines, Inc. v. TSA*, 665 F.3d 170, 175-77 (D.C. Cir. 2011). By treating the prioritization list as merely an initial guide and choosing to make funding decisions based on other, unannounced criteria, TSA had failed to adequately define the trigger and identifiable standard for making a discretionary determination instead of following the list. *Id.* at 177.

To determine how these principles of agency discretion apply to the 2015 SBRM, the Court must ask three questions. First, has Congress put any statutory restrictions on the level of funding for the SBRM? Second, has NMFS reserved the right to use funding as a basis for exempting itself from the standardized methodology and instead applying a discretionary procedure? Third, if NMFS has reserved such discretion, has it adequately defined the trigger for the exemption and an identifiable standard to guide the alternative, discretionary procedure?

**B. No Statutory Restrictions on Funding**

Answering the first question is straightforward. Congress has not directed NMFS to fund the SBRM at any particular level. In its appropriations acts, Congress has made a lump-sum

appropriation to NOAA without mentioning any particular level of funding for the SBRM. *See, e.g.*, Consolidated and Further Continuing Appropriations Act, 2015, 128 Stat. at 2178. In the MSA, Congress required fisheries to establish SBRMs but said nothing about how much funding to devote to them. *See* 16 U.S.C. § 1853(a)(11). Therefore, this Court cannot review whether NMFS has allocated a reasonable amount of funding to the SBRM. *See Lincoln*, 508 U.S. at 192-94; *Int'l Union*, 746 F.2d at 862-63. The Court can review only whether NMFS has created an impermissibly vague funding trigger for departing from the standardized methodology.

## C. Funding Does Not Trigger Departure from the Standardized Methodology

Thus, the Court must decide whether the 2015 SBRM makes funding a basis for departing from the standardized methodology. Between the 2008 SBRM and the 2015 SBRM, NMFS made significant changes in the provisions about how the availability of funding would impact the procedure for determining observer levels. Under the 2008 SBRM, if funding were inadequate to achieve 30% CV levels, NMFS could dispense with the methods outlined in the SBRM and instead make a discretionary determination about the "most appropriate" number and allocation of observers. *Oceana III (Appeal)*, 670 F.3d at 1239-40. Now, under the 2015 SBRM, if funding is inadequate to cover the observer needs calculated based on the 30% CV and importance filter, NMFS must use a non-discretionary formula to determine how much the observer coverage should be reduced in each fishing mode. (AR 6713-16.) The new, non-discretionary way of adapting to funding is itself a "method." (AR 6738.) This change is key because it makes the prioritization process a part of the standardized methodology, rather than a departure from it.

Nothing about the congressional directive to "establish a standardized reporting methodology," 16 U.S.C. § 1853(a)(11), prevents NMFS from including in that methodology a method for adjusting observer coverage based on the availability of funding. Congress did not

define what it meant by a "standardized reporting methodology," but the general usage of those words accommodates the prioritization process. A "methodology" is "a body of methods, rules, and postulates employed by a discipline." Methodology Definition, *Merriam-Webster's Dictionary*, https://www.merriam-webster.com/dictionary/methodology (last visited Aug. 23, 2017). A method is "a procedure or process for attaining an object." Method Definition, *Merriam-Webster's Dictionary*, https://www.merriam-webster.com/dictionary/method (last visited Aug. 23, 2017). The prioritization process is a procedure for attaining an object (i.e., the set of observer coverage levels that will maximize the number of fishing mode and species combinations that can achieve a 30% CV, given a particular level of total funding). It is thus one method in the body of methods related to bycatch reporting that together constitute a methodology. To standardize is "to bring into conformity with a standard." Standardize Definition, *Merriam-Webster's Dictionary*, https://www.merriam-webster.com/dictionary/standardize (last visited Aug. 23, 2017). The prioritization process does not prevent the 2015 SBRM from being standardized. The SBRM uses observers to collect bycatch data for every fishing mode, it uses the same methods to determine the number of observer days in every fishing mode, and it sets out a set of methods to be applied in every year. The use of the word "establish" in the MSA does not bar the methodology from including a prioritization process, since Congress has specifically directed agencies to "establish" prioritization lists in other instances. *See, e.g.*, *Am. Airlines*, 665 F.3d at 175. In sum, NMFS reasonably interpreted § 1853(a)(11) as permitting it to include in the SBRM a non-discretionary method for adapting to available funding.[5]

---

[5] In addition to taking the position in the 2015 SBRM that it was permissible for the methodology to include a method for adapting to funding, NMFS has since issued a final rule that is specifically focused on interpreting the MSA's requirement for an SBRM. *See* Standardized Bycatch Reporting Methodology, 82 Fed. Reg. 6317 (Jan. 19, 2017) (codified at 50 C.F.R. pt. 600). According to that rule, "[r]ecognizing that costs and funding may vary from year to year, a Council must also address

Oceana is wrong in its contention that the standardized methodology requires a minimum precision standard (CV of 30%) and that therefore the prioritization process is a departure from the standardized methodology. (*See* Oceana Mot. at 12-17.) Oceana's argument ignores the complexity of the SBRM, which does *not* establish a uniform 30% CV standard for all fishing modes and species. Rather, it requires an initial calculation of observer levels based on the 30% CV standard and then prescribes standardized adjustments that result in the actual CV value being different for some fishing modes and species. (*See* AR 6481.) The importance filter, which Oceana has not challenged, leads to CV values over 30% for combinations of fishing mode and species "where the infrequency and variable amounts of discards would result in high observer sea day coverage levels, in spite of the fact that the actual magnitude and frequency of discards may be low and of small consequence to the discarded species . . . ." (AR 6691-6701.) Thus, NMFS chose not to set a uniform precision standard for the SBRM. Furthermore, Oceana concedes that NMFS "was not mandated by Congress to establish any such level of precision." (Oceana Opp. & Reply at 4 n.1, ECF No. 29 ("Oceana Reply").) Since NMFS permissibly set out a standardized methodology that does not require a uniform 30% CV standard, the fact that the prioritization process may result in CV values above 30% for some fishing modes and species does not demonstrate that it is a departure from the standardized methodology.

Rather, as the Court has explained, the prioritization process is one of the methods included in the standardized methodology that NMFS has established. No matter how much funding NMFS allocates to the SBRM, NMFS will apply the standardized methodology established in the 2015 SBRM to determine the observer coverage levels. Because the funding decision does not trigger any departure from the standardized methodology to use an alternative, discretionary procedure, the

how implementation of the standardized reporting methodology may be adjusted . . . ." *Id.* at 6338.

D.C. Circuit's rule governing such departures does not apply to the 2015 SBRM.  *See Oceana III (Appeal)*, 670 F.3d at 1241-42.  There is no funding trigger that needs to be adequately defined, nor a discretionary procedure for which the agency must set out an identifiable standard.  Since there is no impermissibly vague funding trigger, the agency's funding allocations to the SBRM are not reviewable.  *See Lincoln*, 508 U.S. at 192-94.  In sum, NMFS is not required to limit its discretion over funding in order to satisfy the MSA's directive that it establish a standardized methodology.

**D. Defined Funding Trigger and Identifiable Standard**

NMFS has not made funding a basis for departing from its standardized methodology, and therefore there is no ground for requiring NMFS to adequately define a funding trigger and identifiable standard.  However, even if the Court found that the prioritization process constituted a discretionary departure from the standardized methodology, it would find that NMFS adequately defined a funding trigger and an identifiable standard.  This is an alternative ground for rejecting Oceana's argument that the 2015 SBRM does not establish a standardized methodology.

The prioritization process easily satisfies the D.C. Circuit's requirement that there be an "'identifiable standard' to guide [the agency's] judgment when operating under [the triggered] procedure."  *Oceana III (Appeal)*, 670 F.3d at 1241.  As the Court explained in detail in the Background section, the prioritization process sets out a non-discretionary procedure to minimize the number of combinations of fishing modes and species that have a CV higher than 30%.  (*See* AR 6715-16.)  Indeed, there is no exercise of judgment, which illustrates how illogical it is to apply the trigger-and-identifiable standard test at all.  Oceana has conceded that the prioritization process includes an identifiable standard, as it failed to make any argument to the contrary.  (*See* Oceana Mot. at 12-17; Oceana Reply at 2-4.)

Oceana argues that NMFS has failed to adequately define the trigger, but the Court

disagrees. (*See* Oceana Reply at 3.) The 2015 SBRM defines the available funding as all funding that NMFS allocates to the Northeast region from four particular NMFS funding lines. (AR 6713.) The four funding lines "represent the primary sources of observer funding in the Greater Atlantic Region, and had been used to fund the SBRM in previous years." Final Rule, 80 Fed. Reg. at 37187. Certainly NMFS retains some discretion about the amount of funding: NMFS decides how to allocate the funds from congressional PPAs among its own funding lines, and it decides how to divide the funding lines between the national office and regions. (*See, e.g.*, AR 7521-22.) The agency may also deduct overhead costs for management, administration, and infrastructure from the regional allocations, as long as those deductions are consistent with historic practice. *See* Final Rule, 80 Fed. Reg. at 37184, 37187-88; AR 6713. But NMFS does not have the "complete discretion" that the D.C. Circuit found problematic in the 2008 SBRM. *See Oceana III (Appeal)*, 670 F.3d at 1241. Funds that NMFS allocates to the Northeast region from the designated four funding lines must go to the SBRM, rather than any other regional programs. (AR 6713.) This is a meaningful constraint on the agency's funding discretion. In response to commenters who argued that the 2015 SBRM would take funds away from other important priorities, NMFS "acknowledge[d] the prioritization process trigger may result in observer funding — previously used by the Agency to discretionarily fund at-sea monitoring, electronic monitoring, and/or supplemental coverage of midwater-trawl vessels — being used exclusively for the SBRM." Final Rule, 80 Fed. Reg. at 37185. "[F]unds previously used to cover groundfish at-sea monitoring will now be required to fund SBRM." *Id.* "The impacts of this change on other monitoring priorities are real . . . ." *Id.* The SBRM's definition of available funding thus constrains the agency's funding discretion.[6]

_____

[6] The definition of the funding trigger meaningfully constrains the agency's discretion given its

Oceana complains that the four funding lines that NMFS has chosen are insufficient to fund the SBRM. (Oceana Mot. at 15-17; Oceana Reply at 3-4.) NMFS acknowledges that "[h]istorically, the available funding [from those four funding lines] has been insufficient to fully fund the SBRM to meet the performance standard." Final Rule, 80 Fed. Reg. at 37184. The problem with Oceana's argument is that it has to do with whether NMFS is allocating a reasonable amount of funding to the SBRM – which the Court cannot review – rather than whether NMFS has adequately defined the funding trigger. Oceana argues that the choice of funding lines condemns the 2015 SBRM because the "new 'trigger' condition is more likely to be the rule than the exception." (Oceana Reply at 3.) It is true that when the D.C. Circuit rejected the 2008 SBRM, it declared that the prioritization process in that version was "the exception that proves this rule and shows it is not a rule at all." *Oceana III (Appeal)*, 670 F.3d at 1243. However, that Court's concern was that NMFS had been told to establish a standardized methodology, but the trigger condition in the 2008 SBRM left NMFS free instead to follow a "non-standardized procedure" in every year that it chose to do so. *See id.* at 1242-43. In the 2008 SBRM, there was no identifiable standard for the alternative procedure, so there really would be no rule if the alternative procedure was the norm. *Id.* at 1242. Here, in contrast, the prioritization process is standardized, so following it does not mean that there "is not a rule at all." *See id.* at 1243.

In sum, there are two alternative grounds for holding that NMFS established a standardized methodology in the 2015 SBRM, even though it permitted adaptation to available funding through the prioritization process. First, the prioritization process is part of the standardized methodology, not a departure from it. Alternatively, NMFS adequately defined the funding trigger for the

_____

current budget structure. If NMFS were to restructure its funding lines in the future to circumvent the constraint on the four funding lines that are named in the 2015 SBRM, a subsequent as-applied challenge could present a different issue.

prioritization process, and there is an identifiable standard for that process.

## III.    RECONSIDERATION WITH NEW EVIDENCE

Oceana argues that after the D.C. Circuit remanded the 2008 SBRM, NMFS improperly failed to consider new evidence on many issues before reaching the same decisions in the 2015 SBRM that it had reached in 2008.  (Oceana Mot. at 17-19.)  In particular, Oceana challenges the agency's treatment of electronic monitoring, observer bias, and non-federally managed species. (*Id.* at 19-26.)  NMFS argues that it was not required to reconsider issues when it believed that no additional insight would be gained.  (Defs.' Mem. at 21-24.)  In addition, NMFS explains why the evidence that Oceana has presented is not important evidence that NMFS failed to consider.  (*Id.* at 27-35.)  The Court concludes that Oceana has not identified any superior evidence that NMFS ignored.

### A.  Legal Standard

In *Oceana III (Appeal)*, 670 F.3d at 1243, the D.C. Circuit instructed this Court to vacate the 2008 SBRM and remand it to the agency for further proceedings consistent with its opinion invalidating the SBRM for failing to establish a standardized methodology.  When a court vacates a rule, the vacatur "requir[es] the agency to initiate another rulemaking proceeding if it would seek to confront the problem anew."  *Indep. U.S. Tanker Owners Comm. v. Dole*, 809 F.2d 847, 854-55 (D.C. Cir. 1987); *Envtl. Def. v. Leavitt*, 329 F. Supp. 2d 55, 64 (D.D.C. 2004).  In the new rulemaking, the agency "complie[s] with the judgment . . . by filling the analytical gap identified in that opinion."  *Heartland Reg. Med. Ctr. v. Leavitt*, 415 F.3d 24, 29 (D.C. Cir. 2005).  That is the "only obligation" imposed by the remand.  *Id.*  Although Oceana seems to believe that NMFS was required to "start[] from scratch" and reconsider everything in the SBRM (Oceana Mot. at 17-19), that is not correct.

Still, Oceana is correct that NMFS could not ignore important evidence when it developed the 2015 SBRM. (*See* Oceana Mot. at 17-19.) The source for that obligation is not the remand order, but the APA and the MSA. The APA standard provides a weaker version of the obligation. Agency action is arbitrary and capricious if the agency "entirely failed to consider an important aspect of the problem" or its explanation "runs counter to the evidence before the agency." *Motor Vehicle*, 463 U.S. at 43. Action is also arbitrary when the agency fails to respond to "relevant and significant public comments." *Cape Cod Hosp. v. Sebelius*, 630 F.3d 203, 211 (D.C. Cir. 2011) (quoting *Pub. Citizen, Inc. v. FAA*, 988 F.2d 186, 197 (D.C. Cir. 1993)). The stronger standard comes from the MSA, which requires that rules for fishery conservation and management "be based upon the best scientific information available." 16 U.S.C. § 1851(a)(2); *see Oceana II*, 384 F. Supp. 2d at 232. The agency must use the best scientific information *available*, not the best scientific information *possible*. *Bldg. Indus. Ass'n of Superior California v. Norton*, 247 F.3d 1241, 1246 (D.C. Cir. 2001); *N. Carolina Fisheries Ass'n, Inc. v. Gutierrez*, 518 F. Supp. 2d 62, 85 (D.D.C. 2007). To succeed on a challenge that NMFS did not use the best scientific information available, Oceana must point to superior information that was available and that the agency ignored. *Bldg. Indus. Ass'n*, 247 F.3d at 1247; *N. Carolina Fisheries*, 518 F. Supp. 2d at 85. Although Oceana never mentioned the higher standard that the MSA imposes on the agency, the Court will consider the evidence that Oceana has presented regarding each specific issue and explain why Oceana's challenges fail even under that standard.

## B. Electronic Monitoring

In the 2015 SBRM, NMFS considered expanding the suite of mechanisms for bycatch reporting to include electronic monitoring, in addition to at-sea observer coverage. (AR 6687.) Electronic monitoring would involve using video cameras to record visual data, which could later

be analyzed to obtain bycatch information. (AR 6610-11.) However, NMFS concluded that electronic monitoring technology "is not considered to be sufficiently mature for widespread implementation at this time" and would take additional development effort to be usable for bycatch monitoring. (AR 6688, 6742.) Both the capabilities and the costs of electronic monitoring were concerns. According to NMFS, electronic monitoring is currently capable of collecting only presence/absence data, whereas at-sea observers can collect more detailed data, including weight and length. (AR 6611-12, 6729.) Furthermore, although electronic monitoring has been successful in fixed gear fisheries and trawl fisheries with relatively homogeneous catch compositions, more complex monitoring systems are required for larger vessels, more complex fishing gear, and more diverse catches. (AR 6611, 6688, 6728.) As for costs, NMFS relied on a 2006 study by Kinsolving, which concluded that "the total costs of an electronic monitoring program currently may equal or surpass the cost of an onboard observer program." (AR 6729.) NMFS pointed to the significant cost of equipment and also of reviewing and analyzing video footage to extract bycatch information. (AR 6612, 6762-65.) Although NMFS rejected electronic monitoring in its current form, it noted that studies were underway to develop and test it further. (AR 6611, 6688, 6742.)

Oceana argues that NMFS failed to consider new research on electronic monitoring before rejecting it in the 2015 SBRM. (Oceana Mot. at 21-22.) Oceana points to only one study that the agency allegedly should have considered: Julie Bonney, et al., *Continued Assessment of an Electronic Monitoring System for Quantifying At-Sea Halibut Discards in the Central Gulf of Alaska Rockfish Fishery*, EFP 08-01 Final Report, Alaska Groundfish Data Bank (2009). (*See id.*) According to Oceana, this study shows that electronic monitoring could be cheaper than observers for some vessels. (*Id.*)

NMFS had no obligation to discuss the Bonney study in the 2015 SBRM or Final Rule.

Although Oceana's comment letter on the proposed rule expressed concern that NFMS did not consider the most recent information about electronic monitoring, neither Oceana's comments on the proposed rule nor its earlier comments on the SBRM mentioned the Bonney study. (*See* AR 7133-45, 4901-02.) Furthermore, Oceana has not demonstrated that the Bonney study provides superior evidence about the capabilities or cost-effectiveness of electronic monitoring. In support of its cross-motion, NMFS explains that the Bonney study tested electronic monitoring in a simple situation involving a single species of bycatch that was significantly different in appearance and size from the targeted species. (Defs.' Mem. at 30.) As a result, it did not shed light on the feasibility of using electronic monitoring for the more complex bycatch situations covered by the SBRM. (*Id.*) Oceana does not dispute this point in its reply and, therefore, has conceded it. (*See* Oceana Reply at 8-10.) In addition, the Bonney study determined that installing electronic monitoring systems on a vessel could be cheaper than having observers monitor a vessel for the entire season, but it did not evaluate the cost of electronic monitoring relative to using observer coverage for a sample of trips. (*See* Bonney at 7, 26, ECF No. 28-2.) As NMFS explained in response to another commenter who suggested that electronic monitoring could provide a lower sea-day cost than observers, "[e]ven at a potentially lower cost per day, the increase in coverage to 100 percent of trips would likely result in a program that is significantly more expensive than the SBRM is currently." Final Rule, 80 Fed. Reg. at 37191. Since the 2015 SBRM uses observers for a sample of trips, the Bonney study does not alter the agency's conclusion that electronic monitoring would cost at least as much as the chosen method.

In a footnote in its initial brief and at greater length in its reply, Oceana also contends that NMFS improperly considered only whether to replace the at-sea observer program with electronic monitoring, when it should have considered whether electronic monitoring could be a

supplementary mechanism for collecting bycatch data. (Oceana Mot. at 20 n. 7; Oceana Reply at 7-8.) Oceana points to the Final Rule, which stated that "electronic monitoring is not currently sufficiently developed or suitable to be a viable replacement for at-sea observers for the purpose of the SBRM" and "electronic monitoring is not yet considered robust enough to replace observers for bycatch monitoring in some gears types or for identifying all bycatch to the species level." 80 Fed. Reg. at 37185, 37191. The agency's use of the word "replace" does not show that it only considered a wholesale shift from at-sea observers to electronic monitoring. NMFS used the word "replace" to discuss whether some trips could collect bycatch information with electronic monitoring instead of observers. The 2015 SBRM clearly states that NMFS considered making electronic monitoring an "additional bycatch information collection mechanism." (AR 6687.) Oceana does not and cannot seriously argue that electronic monitoring would be a useful supplement even if it could not replace observers on any trips, so trips would have to use (and pay for) both mechanisms at the same time. In sum, NMFS did not refuse to consider supplemental electronic monitoring as an alternative or improperly ignore the Bonney study.[7]

## C. Observer Bias

To evaluate how accurate the bycatch data generated by the proposed at-sea observer program would be, NMFS considered the potential for observer bias. (AR 6652-54.) Observer bias would exist if vessels carrying observers consistently behave differently from vessels without observers, so that the bycatch rates reported by the observers are not representative of all trips. (*Id.* at 6652.) Based upon a number of studies, NMFS concluded that observer bias was not a

---

[7] Oceana also argues that "rejection of electronic monitoring as a supplementary tool contravened the Fisheries Service's own policy, adopted in 2013, 'to encourage the consideration of electronic technologies . . . .'" (Oceana Mot. at 19-20.) As the Court has discussed, NMFS did consider electronic monitoring. Rejecting it after consideration does not contravene a policy encouraging consideration.

significant concern. A study based on 2004 data showed no evidence of a significant difference in the average catch between observed and unobserved trips, although there was a small difference in average trip duration and differences in the spatial distribution of fishing effort on some trips. (*Id.* at 6652-54.) A 2012 study by Wigley et al. "found there was little evidence of systematic bias across all fleets. There are a few fleets where evidence suggests there may be differences between observed and unobserved vessels that could affect discard estimates. However, further investigation would be needed to determine if these differences could lead to inaccurate discard estimates." (*Id.* at 6654.) Finally, a 2013 report by Rago concluded that discard rates on unobserved trips would have to be at least 5 to 10 times greater than the observed rates to pose an appreciable risk of exceeding the acceptable biological catch. (*Id.*) "The bias analyses conducted to date do not suggest behavioral differences of this magnitude." (*Id.*)

In comments on the 2015 SBRM and the proposed rule implementing it, Oceana argued that an analysis by Demarest, which was an appendix to the 2013 Rago report, showed a consistent pattern of different fishing behavior when an observer is on board. (*See* AR 7143, 4888-89.) In the Final Rule, NMFS responded that Oceana was correct that the analysis in the 2013 report found differences in fishing behavior between observed and unobserved trips, but it did not determine whether the differences would result in different discard rates. 80 Fed. Reg. at 37187. Furthermore, the agency reiterated that "even if there is some bias, the discard rate for the groundfish sector trips studied would need to be five to ten times higher on unobserved trips for total catch to exceed the acceptable biological catch." *Id.*

Now, Oceana argues again that NMFS did not seriously address the Demarest analysis. (Oceana Mot. at 25-26, Oceana Reply at 12.) Oceana is correct that Demarest found a "relatively consistent pattern of different fishing behaviors when an observer is on board and when one is not."

(AR 5096; *see* Oceana Mot. at 25.)  However, Oceana ignores that the "differences are . . . on the order of 1-4%," the measured behaviors did not include discard rates, and the study "provides no insight into the impact of [an observer] on discarding behavior."  (AR 5095-96.)  The 2013 Rago report included the Demarest analysis as Appendix C and cited it to conclude that differences on the order of 1-4% indicate vessels tend to fish for a longer time and catch more of everything when they do not have observers on board, but the measured differences cannot be used to predict differences in discard rates.  (AR 5049-50).  Rago then performed further analyses showing that for most stocks, the rate of discard on unobserved trips would have to be at least several times that on observed trips for the probability of exceeding annual catch limits to be even 5%.  (AR 5050-51.)  Similarly, the unobserved discard rates would have to be at least 5 to 10 times greater than observed rates for there to be an appreciable risk of exceeding acceptable biological catch.  (*Id.*)  As the Court has described, NMFS cited to the 2013 Rago report to conclude that there was no evidence that the presence of observers had a significant impact on discard rates.  (AR 6654; Final Rule, 80 Fed. Reg. at 37187.)  Thus, NMFS considered the results of the Demarest analysis, and its conclusion about observer bias was entirely reasonable, given the tiny behavioral differences measured by Demarest.

Even if NMFS suspected some observer bias, Oceana has made no concrete suggestion about how the SBRM could be changed to account for that concern.  Placing observers on all fishing trips, so that there would be no need to worry about differences between observed and unobserved trips, would be prohibitively expensive.  Using electronic monitoring to avoid observer bias is not yet a viable option.  *See* Part III.B.  Finally, the agency cannot apply a correction factor to account for any observer bias, because even the expert report submitted by Oceana acknowledges that "it is not possible with the information available to quantify the direction or

magnitude of the potential biases in the observer estimates of discards." (AR 4992.) Taking into account the best information available and the options for measuring bycatch rates, the agency's treatment of observer bias was reasonable.

### D. Non-Federally Managed Species

Under the 2015 SBRM, NMFS bases its allocation of observers on a calculation of the observer days needed to achieve a 30% CV for federally managed species. (*See* AR 6721-22, 7063-64.) NMFS chose not to consider non-federally managed species in the design of the SBRM. (*Id.*) However, while NMFS allocates observers to fishing vessels based on the reporting needs for managed species, those observers still record information about all species encountered by the vessels. (AR 6722.) According to NMFS, it did not consider non-managed species in the design of the SBRM because they were beyond the scope required by the MSA. (*Id.*) Federally managed species accounted for 82.8 percent of observed discards in 2012, meaning that non-federally managed species accounted for only 17.2 percent. (AR 6721.) NMFS interpreted the MSA to require that the SBRM include methods for reporting bycatch of all species encountered but not to require the same precision and accuracy for all species. (AR 7064.) Specifically, NMFS intended for the SBRM to achieve sufficient precision and accuracy to support management measures for federally managed species, but it did not believe such precision and accuracy were necessary for species that would not be subject to federal management measures. (*See id.*)

Oceana argues that excluding non-federally managed species from the 30% CV standard prevents the SBRM from being a standardized methodology for all bycatch. (Oceana Mot. at 22-25.) When Oceana made this same argument in 2008, this Court rejected it because the MSA "includes no requirement that all species of bycatch be estimated with the same degree of precision and accuracy." *Oceana III*, 725 F. Supp. 2d at 58. The Court concluded that it was not improper

for NMFS to limit the 30% CV standard "to the bulk, in terms of weight, of bycatch." *Id.* In re-asserting this challenge, Oceana labels it as an issue that NMFS was required to reconsider with new evidence. (*See* Oceana Mot. at 17.) Notwithstanding that label, Oceana actually makes an argument about statutory interpretation rather than evidence. (*See id.* at 22-25.) According to Oceana, the plain language of the MSA bars the agency from excluding non-federally managed species from the 30% CV standard in the SBRM. (*Id.*) The Court has already ruled on this issue, *see Oceana III*, 725 F. Supp. 2d at 57-59, but for completeness, the Court will explain briefly why Oceana's legal argument fails.

To elucidate its requirement that NMFS "establish a standardized reporting methodology to assess the amount and type of bycatch occurring in the fishery," 16 U.S.C. § 1853(a)(11), Congress provided definitions of some but not all of the terms used in that statutory provision. Because the MSA defines "bycatch" without reference to whether the discarded fish are federally managed species, *see* 16 U.S.C. § 1802(2), (12), (13), NMFS agrees with Oceana that "without a method to assess and report bycatch of all species encountered by a fishing vessel, the SBRM would be incomplete." (AR 7064.) However, Congress stated "no requirement that all species of bycatch be estimated with the same degree of precision and accuracy." *Oceana III*, 725 F. Supp. 2d at 58. Congress did require that the methodology be "standardized," 16 U.S.C. 1853(a)(11), but it did not define what that meant. NMFS interpreted the term "standardized" to require that "bycatch data reporting/collection is standardized for each reporting/collection method (i.e., the dock intercept survey is done the same way for all participants in the relevant fishery)," but not to require that the same standards apply to managed and non-managed species. (AR 6477, 7064.) Differentiating species based on whether they are federally managed is consistent with the purpose of the SBRM, because "the primary purpose of bycatch reporting and monitoring is to collect information that can

be used reliably as the basis for making sound fisheries management decisions." (AR 6473.) Since Congress did not specify which features of the SBRM should be standardized, and it would be neither possible nor productive to standardize everything,[8] it was reasonable for NMFS to use the purpose of the SBRM as a basis for deciding what to standardize. Thus, the agency's decision not to apply the 30% CV standard to non-federally managed species did not violate the congressional mandate that the methodology be "standardized."

## IV. PRECISION STANDARD

In addition to challenging various aspects of how the 2015 SBRM applies its 30% CV standard, Oceana also challenges the choice of 30% as the level of precision. According to Oceana, NMFS did not adequately justify why it chose 30% rather than another level in the 20-30% range recommended by the National Working Group on Bycatch. (Oceana Mot. at 26-27.) Oceana challenged the 30% CV standard in the 2008 SBRM as well, and this Court determined that it was reasonable. *Oceana III*, 725 F. Supp. 2d at 65-66. Because this Court's last opinion focused on the reasonableness of using a uniform 30% CV standard, as opposed to tailoring it to individual species, the Court will now explain why Oceana's current argument about the range recommended by the working group does not alter the Court's decision.

The source for the 30% CV standard in the 2015 SBRM was a report by the National Working Group on Bycatch, which concluded that "the recommended precision goal is a 20-30 percent CV for estimates of total discards (aggregated over all species) for the fishery." (AR 6622-

---

[8] It would not be possible to standardize every aspect of the SBRM. For example, standardizing the CV standard for all combinations of fishing modes and species makes it impossible to standardize the proportion of trips in each fishing mode that are observed, because different proportions are required in different modes to achieve the same CV standard. It would also not be productive to standardize every aspect. For example, applying the same CV standard to all fishing modes and species regardless of their importance would result in enormous expenditures to obtain data with little value. That is why the SBRM uses the importance filter to adjust observer coverage.

23.) NMFS chose to use a 30% CV standard, the least precise end of the recommended range, because the SBRM would apply that CV standard to each combination of fishing mode and species or species group, rather than to an aggregated estimate of all discards in a fishery. (AR 6622-23, 6703-04.) Estimates of total discards would have "much lower total variability" — that is, a lower CV value — than the individual estimates for each combination of fishing mode and species. Final Rule, 80 Fed. Reg. at 37187.

Contrary to Oceana's claim that NMFS "fail[ed] to provide any justification for its selection of a 30% CV" (Oceana Mot. at 27), NMFS stated its reason clearly: The SBRM applies its CV standard to individual combinations of fishing mode and species, whereas the working group recommendation was for total discards in a fishery. (AR 6622-23, 6703-04.) This is the kind of technical judgment to which the Court must defer. *Oceana III*, 725 F. Supp. 2d at 66. It is also a logical reason. Achieving a precision standard for individual estimates of many small categories requires a much larger sample and therefore more expense than achieving the same precision standard for an aggregate estimate. Furthermore, even if the CV standard for individual categories is 30%, the CV value for the aggregate estimate will be much less than 30%. Final Rule, 80 Fed. Reg. at 37187. Despite the agency's identification of this reason in the SBRM and in its briefing (*see* Defs.' Mem. at 25-26), Oceana has never offered any explanation about why the reason is inadequate (*see* Oceana Mot. at 26-27; Oceana Reply at 13-15). Both because the Court finds the explanation in the SBRM to be logical and because Oceana has failed to articulate any challenge to it, the Court rejects Oceana's claim that NMFS did not adequately justify the 30% CV standard.

## V.     NATIONAL ENVIRONMENTAL POLICY ACT

To comply with NEPA, NMFS prepared an environmental assessment for the 2015 SBRM and concluded that it would have no significant impact on the environment. Oceana contends that

the environmental assessment was inadequate because NMFS failed to consider how the SBRM would impact management decisions that are based on the data collected. (Oceana Mot. at 27-35; Oceana Reply at 15-24.) The Court agrees with NMFS that the environmental impacts of management decisions that might be based on improved data are not reasonably foreseeable. (*See* Defs.' Mem. at 37-41.)

### A. Legal Standard

When a federal agency proposes a major federal action "significantly affecting the quality of the human environment," NEPA requires that the agency prepare a detailed environmental impact statement (EIS). 42 U.S.C. § 4332(C). To decide whether the action has a significant impact on the environment, such that the EIS is required, agencies develop an environmental assessment. 40 C.F.R. § 1501.4. In an environmental assessment, the authoring agency must take a "hard look" at whether the proposed action will have environmental impacts. *Sierra Club v. U.S. Dep't of Energy*, No. 15-1489, 2017 WL 3480702, at *5 (D.C. Cir. Aug. 15, 2017); *Grand Canyon Trust v. FAA*, 290 F.3d 339, 340-41 (D.C. Cir. 2002).[9]

The impacts that the agency must consider include direct, indirect, and cumulative impacts. *TOMAC, Taxpayers of Michigan Against Casinos v. Norton*, 433 F.3d 852, 864 (D.C. Cir. 2006). Direct impacts or effects (the regulations use the terms "impact" and "effect" interchangeably) are

---

[9] The parties dispute whether the proper standard is simply the "hard look" test or a four-pronged test. The D.C. Circuit uses the "hard look" test and the four-pronged test interchangeably, and there does not appear to be a substantive difference between the two. *Compare Sierra Club*, 2017 WL 3480702, at *5 (requiring agency to take a "hard look" at the environmental consequences) *with Am. Wild Horse Pres. Campaign v. Perdue*, No. 15-5332, 2017 WL 3318750, at *12 (D.C. Cir. Aug. 4, 2017) (requiring that agency "(i) 'accurately identified the relevant environmental concern,' (ii) took a 'hard look at the problem' in making its decision, (iii) has made 'a convincing case for its finding of no significant impact,' and (iv) 'has shown that even if there is an impact of true significance, an [Environmental Impact Statement] is unnecessary because changes and safeguards in the project sufficiently reduce the impact to a minimum.' *Sierra Club v. Van Antwerp*, 661 F.3d 1147, 1154 (D.C. Cir. 2011).").

those that "are caused by the action and occur at the same time and place." 40 C.F.R. § 1508.8. Indirect effects are those "which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable. Indirect effects may include growth inducing effects and other effects related to induced changes in the pattern of land use . . . ." *Id.* Finally, "[c]umulative impact is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions . . . ." 40 C.F.R. § 1508.7. The purpose of requiring agencies to consider cumulative impacts is "to prevent [them] from dividing one project into multiple individual actions 'each of which individually has an insignificant environmental impact, but which collectively have a substantial impact.'" *NRDC v. Hodel*, 865 F.2d 288, 297-98 (D.C. Cir. 1988) (quoting *Thomas v. Peterson*, 753 F.2d 754, 758 (9th Cir. 1985)).

In addition to considering the impacts of the proposed action, an agency must provide brief discussions of alternatives to the proposed action and environmental impacts of those alternatives. 40 C.F.R. § 1508.9. The agency must consider a reasonable range of alternatives, but it need not consider options that are inconsistent with the action's purpose. *Oceana III*, 725 F. Supp. 2d at 71.

Courts have only a limited role in reviewing the adequacy of agencies' environmental assessments and their findings of no significant impact (FONSI). *TOMAC*, 433 F.3d at 860. They review agencies' decisions under the APA's arbitrary and capricious standard, with the aim of "ensur[ing] 'that no arguably significant consequences have been ignored.'" *Id.* at 860-61 (quoting *Pub. Citizen v. Nat'l Highway Traffic Safety Admin.*, 848 F.2d 256, 267 (D.C.Cir. 1988)). "NEPA does not require agencies to examine every possible environmental consequence. Detailed analysis is required only where impacts are likely." *Izaak Walton League of Am. v. Marsh*, 655 F.2d 346, 377 (D.D.C. 1981). Agencies must consider reasonably foreseeable effects but "need not foresee

the unforeseeable." *Sierra Club*, 2017 WL 3480702, at *6 (quoting *Scientists' Inst. for Pub. Info.,*
*Inc. v. Atomic Energy Comm'n*, 481 F.2d 1079, 1092 (D.C. Cir. 1973)).

## B. Indirect and Cumulative Impacts

In the environmental assessment for the 2015 SBRM, NMFS stated that "as the focus of this
amendment is on the methodology by which bycatch information is obtained, analyzed, and
utilized, the impacts of the preferred alternatives are wholly procedural in nature."  (AR 6745.)
"The measures would not impose or result in any changes to fishing operations, fishing behavior,
fishing gears used, or areas fished."  (AR 6797.)  "[P]otential management actions, which may
eventually stem from implementation of the SBRM, are too remote and speculative" to be
considered.  (AR 6760.)  NMFS concluded that there were "no associated direct impacts on the
environment" and no cumulative impacts on fishing areas or marine resources.  (AR 6798, 6801.)

Oceana argues that NMFS "ignored the indirect and cumulative impacts" that the SBRM
will have as a result of the fact that it "define[s] and determine[s] the quality, reliability, and
accuracy of the data the agency will use in making critical fishery management decisions . . . ."
(Oceana Mot. at 30, 34.)  The Court already rejected this argument in its opinion on the 2008
SBRM, holding that "any potential downstream impacts" were not reasonably foreseeable.  *Oceana*
*III*, 725 F. Supp. 2d at 70.  Furthermore, Oceana has been unable to provide any case requiring an
agency that conducts an environmental assessment for a data collection methodology to consider
the effects of changing data quality on future actions.  (*See* Oceana Supp. Mem. at 6, ECF No. 35.)

Most importantly, NMFS provided a "reasoned explanation" in the environmental
assessment for the 2015 SBRM about "why it believed [environmental effects] were not reasonably
foreseeable."  *Sierra Club*, 2017 WL 3480702, at *7.   Far from ignoring the fact that data affect
management measures, NMFS acknowledged that the primary purpose of bycatch reporting is to

collect information that can be used as the basis for management decisions, and the authors of the environmental assessment attempted to determine what would be "likely management implications of an 'improved' data collection program." (AR 6473, 6759.) Despite that recognition, NMFS nevertheless concluded that it could not predict any downstream effects in the form of management measures. (AR 6759-60.) The agency gave three reasons for its conclusion. First, "implementation of the amendment does not, by itself, guarantee that there would be an improvement in data quality" because "an improvement in data quality is contingent upon sufficient funding." (*Id.*) Second, "there is no way to predict whether the resulting data would indicate that future estimates of discards would be higher or lower than current estimates," and therefore, "there is no way to predict whether changes in management would be required." (*Id.*) Finally, "the management measures that might be implemented, should action be determined to be necessary to address a bycatch concern, also cannot be predicted." (*Id.*) These are all logical points, and they adequately explain why NMFS cannot reasonably foresee environmental impacts from the SBRM.

Indeed, Oceana has not pointed to any particular positive or negative effect that NMFS should have foreseen would flow from management reactions to the data collected. (*See* Oceana Mot. at 27-38; Oceana Reply at 15-24.) The fact that data will influence management decisions is too abstract to constitute an effect warranting a more detailed analysis in an environmental impact statement. Further study would not enable NMFS to predict future management measures with any greater specificity. In an attempt to identify more concrete effects, Oceana argues that the commitment of funding to the SBRM will reduce funding for observer programs focused on issues other than bycatch and also reduce funding for the development of electronic monitoring techniques. (Oceana Mot. at 31-33.) This contention is irrelevant to Oceana's broader argument

about how SBRM data quality will influence management measures for bycatch. It is also surprising that Oceana would argue that the SBRM is depriving other programs of funding, given that Oceana has argued at length that NMFS has chosen funding lines that will not provide enough funding to the SBRM. (*See* Oceana Mot. at 12-17.) The contradiction in Oceana's arguments highlights the balancing of factors that is necessary to allocate funding and underlies the rule that such funding decisions are normally committed to agency discretion. *See* Part II.C. In any case, the environmental effects of changing data quality in other observer programs are no more foreseeable than the effects of changing data quality in bycatch observation. Likewise, how quickly NMFS is able to develop electronic monitoring technology may affect the expense and quality of data collected from bycatch monitoring, but there are no particular environmental impacts that are reasonably foreseeable. (*See* AR 6760-65.)

Readers should not worry that the Court's decision about the foreseeability of environmental impacts excuses agencies from considering data quality when they develop data collection methodologies. To the contrary, the fact that better data will facilitate better policy judgments is highly relevant to evaluating whether an agency's choice of methodology was rational. That is why Oceana could challenge (and has challenged) the SBRM as arbitrary and capricious based on how well it achieves precision and accuracy. *See* Parts III.C, IV. The Court is merely deciding that it is appropriate to frame such challenges to data quality as APA challenges (or MSA challenges, in the case of fishery regulations), rather than as NEPA challenges.

## C. Effects on Annual Catch Limits and Accountability Measures

In its motion for summary judgment, Oceana also argued that the analysis of alternatives ignored how the SBRM would affect the setting of annual catch limits (ACLs) and the development of accountability measures (AMs) to enforce ACLs. (Oceana Mot. at 36-38.) In response, NMFS

argued that the SBRM was not required to provide the data necessary for ACLs and AMs. (Defs.' Mem. at 41-44.) While section 1853(a)(11) of the MSA requires NMFS to establish an SBRM, a separate provision requires it to "establish a mechanism for specifying annual catch limits in the plan (including a multiyear plan), implementing regulations, or annual specifications, at a level such that overfishing does not occur in the fishery, including measures to ensure accountability." *See* 16 U.S.C. § 1853(a)(15). Judge Boasberg has concluded that "§ (a)(15) and § (a)(11) impose two distinct requirements, as opposed to one fused mandate." *Oceana, Inc. v. Locke*, 831 F. Supp. 2d 95, 108-09 (D.D.C. 2011). In other words, the MSA does not require that the SBRM be the mechanism for ensuring accountability with ACLs. *Id.* Oceana's reply concedes that "[t]he Magnuson-Stevens Act may not require Fishery Management plans to include an SBRM that ensures accountability with ACLs . . . ." (Oceana Reply at 23.) Rather than arguing that NMFS was required to "analyz[e] the use of SBRM to set ACLs as an alternative," Oceana says that its argument is that NMFS should have "analyz[ed] how the SBRM will affect setting ACLs." (*Id.* at 22.) According to Oceana, NMFS needed to consider how the data collected would "have a direct and cumulative impact on the ability to confidently set ACLs." (*Id.* at 23.)

As reframed in its reply, Oceana's argument about impacts on ACLs and AMs is simply a special case of its broader argument that NMFS was required to consider impacts on management measures. The Court has already rejected this argument because such impacts are not reasonably foreseeable. *See* Part V.B. Effects on ACLs and AMs are particularly unforeseeable because the separate MSA provision requires measures to ensure accountability with ACLs, and monitoring for that purpose exists in addition to the SBRM. *See* AR 6596; Final Rule, 80 Fed. Reg. at 37186; *Oceana, Inc. v. Locke*, 831 F. Supp. 2d 95, 109-14 (D.D.C. 2011). Since additional data are available from observer programs that are specifically designed to monitor ACLs and support AMs,

NMFS cannot reasonably foresee how the quality of the SBRM data will impact ACLs and AMs. Therefore, the agency did not violate NEPA by developing an environmental assessment without discussion of possible effects on setting ACLs and developing AMs.

## CONCLUSION

Oceana has not identified any feature of the 2015 SBRM that violates the MSA, APA, or NEPA. For the foregoing reasons, the Court will deny Oceana's motion for summary judgment and grant defendants' cross-motion for summary judgment. A separate Order accompanies this Memorandum Opinion.


/s/   *Ellen Segal Huvelle*
ELLEN SEGAL HUVELLE
United States District Judge


Date:   August 24, 2017